# United States Court of Appeals
## For the First Circuit

No. 09-1250

MICHAEL J. FOLEY,

Plaintiff, Appellant,

v.

LAWRENCE KIELY; GERALD P. COLLINS; DIANA DIPIETRANTONIO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Andrew M. Fischer with whom Jason & Fischer was on brief for appellant.
Margaret A. Rubino with whom Joseph P. Kittredge and Rafanelli & Kittredge, P.C. were on brief for appellee Kiely.
Brian Rogal with whom Rogal & Donnellan, P.C. was on brief for appellee Collins.
Michael D. Brennan with whom Timothy M. Burke was on brief for appellee Diana DiPietrantonio.

April 15, 2010

**STAHL**, <u>Circuit Judge</u>.  Plaintiff-appellant Michael Foley appeals the dismissal of his 42 U.S.C. § 1983 claims against Defendants Lawrence Kiely and Gerald Collins, Massachusetts State Troopers, and Defendant Diana DiPientrantonio, a sergeant with the Massachusetts State Police.[1]  Foley claims that Troopers Kiely and Collins unconstitutionally seized and arrested him.  The District of Massachusetts granted summary judgment in favor of Defendants, and after a de novo review, we affirm.

## I. Facts and Background

Because we review this case after a grant of summary judgment, we present the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  <u>Estrada</u> v. <u>Rhode Island</u>, 594 F.3d 56, 59 n.2 (1st Cir. 2010).

Foley is fifty-five years old and has no home address, but sleeps outside in different locations in the Newton, Weston, and Waltham, Massachusetts area.  One place he frequents is the Norumbega Park[2] ("Norumbega") in Weston.

---

[1]Though DiPientrantonio is still named as a defendant in this action, there is no evidence that she took any action with regard to Foley other than signing the paperwork that caused him to be charged with being a fugitive from justice.  This she did in her role as the police prosecutor for the Framingham State Police Barracks.  Foley does not mention DiPientrantonio in either his opening or reply brief, and we thus deem his claims against her waived.

[2]Defendants refer to Norumbega as "Norumbega Duck Pond" while Foley calls it "Nurembega Park."

On December 4, 2004, Kiely and Collins were working their regular assigned patrol shift as Massachusetts State Troopers. Their patrol area included performing periodic facilities checks at Norumbega. Norumbega is a public park, and there had been complaints of lewd and lascivious behavior as well as car break-ins in the area. Additionally, the Massachusetts Water Resources Authority ("MWRA") has access pipes on site, and since September 11, 2001, the State Police have conducted security checks at Norumbega for the MWRA.

On the afternoon of December 4, "probably between three and 4:30, 5:00," Collins performed a facilities check at Norumbega. At that time, Collins observed Foley walking around the pond. There were many other people in the area at the time, and Collins had no interaction with Foley. When Collins returned to the area at about 6:30 p.m., he noticed a few distinct flashes from a flashlight. He discovered that the person shining the flashlight was the same person he had previously observed walking around the pond. Collins asked Foley why he had been shining a flashlight in Collins's direction, and Foley said he had the flashlight for his own safety and so he could see what he was doing. Collins informed Foley that he was in a high crime area and that there had been problems with lewd and lascivious behavior and breaking into cars. He asked Foley if anyone had ever bothered Foley or given him a hard time, and Foley said that lately he had been left alone for

the most part.  Collins neither knew, nor did he inquire about, Foley's name.

Later that night, Collins had a conversation with Kiely about having observed the same person at Norumbega over the course of a few hours.  Collins asked Kiely to go back to Norumbega with him and to back him up in the event that the individual was still there.

At approximately 10:30 p.m., Collins returned to the park with Kiely.  Kiely and Collins both observed Foley walking along the water, and Foley "sought to avoid unnecessary contact with [them]."  According to Kiely and Collins, Foley attempted to duck behind some shrubbery along the waterside.  Kiely approached Foley and asked him for his name, and Foley replied, "Foley, Michael Foley."[3]  Kiely then asked Foley for his date of birth, and Foley provided it.  The troopers also asked Foley for his Social Security number, but he refused to provide it, allegedly saying that he did not know it.[4]  Foley alleges that the troopers then told him that he could not leave and prevented him from leaving by grabbing him.

---

[3]Kiely and Collins assert that they also asked Foley for his middle initial, and Foley stated that it was "F."  Foley claims, however, that he did not give a middle initial, and for purposes of summary judgment, we accept Foley's version of the facts.

[4]Foley's own deposition is unclear on this point.  At one point he states that he told the troopers that he did not know what his Social Security number was.  At another point, he states that he "refused" to give his Social Security number.  When asked why he refused, he states "[p]rivate information.  I didn't want to."

-4-

The troopers conducted a warrant check using the name and date of birth that Foley had provided and found that a person of that date of birth and name had a Board of Probation ("BOP") record and that there was an outstanding federal National Crime Information Center ("NCIC") warrant for the arrest of that person out of the state of Florida. The Florida warrant was dated April 24, 1974. Kiely contacted Troop Headquarters to confirm the information, and the dispatcher at Headquarters verified that there was an outstanding NCIC warrant out of Florida matching the name and date of birth provided by Foley. Because Foley told the troopers that he had never been to Florida, Kiely sought and obtained additional information from Foley to attempt to confirm that Foley was the subject of the warrant. Foley on inquiry provided his mother's maiden name as "Peters," and the dispatcher at Troop Headquarters told Kiely that according to the BOP record, the mother's name was Marjorie Peters. Though Foley had not provided a Social Security number, the Social Security number on the BOP record matched the Social Security number on the Florida warrant. The information provided in the Warrant Management System indicated that Miami Dade County, Florida would extradite.

Foley was placed under arrest for being a fugitive from justice and transported by Kiely to the State Police barracks in Framingham. The total length of the stop prior to Foley's arrest is unclear from the record, but we will assume that it was no

longer than an hour, as Foley concedes.[5]  At Foley's arraignment on December 6, 2004, bail was set.  Because Foley was unable to post bail, he was transported to Middlesex County Jail, where he was held for approximately ten days until the criminal charge against him was dismissed.

## II. Discussion

Summary judgment is appropriate if, viewing all factual disputes in the light most favorable to the non-moving party, there is no genuine issue as to any material fact that would prevent judgment in favor of the moving party as a matter of law.  Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010).  We review a district court's grant of summary judgment de novo.  Id.

### A. Initial Stop

As an initial matter, we presume that the troopers' 10:30 p.m. interaction with Foley constituted a seizure in that Foley's deposition testimony indicates that a reasonable person would not have felt free to leave or to terminate the encounter.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

It is well-established, however, that not every seizure is an arrest requiring probable cause under the Fourth Amendment. Foley claims that once the police prevented him from leaving, the

---

[5]We note that when Foley was asked at his deposition how long he was with the troopers in the parking lot of the pond before he was handcuffed and placed in the cruiser, he said "[b]etween 10 to 20 minutes.  Maybe more.  I can't remember exactly."

stop constituted an arrest for which probable cause was required, but Foley misreads the law. There are "certain encounters between police and private citizens, called Terry stops, that fall short of the intrusiveness of a full arrest." Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2009). In such circumstances, an officer may make a brief investigatory stop of an individual if the officer has reasonable suspicion "that criminal activity may be afoot." United States v. Am, 564 F.3d 25, 29 (1st Cir. 2009) (citing United States v. Arvizu, 534 U.S. 266 (2002)).

We follow a two-pronged inquiry to evaluate "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." Am, 564 F.3d at 29 (citations omitted).

To satisfy the first prong, we evaluate whether the troopers can point to "a particularized and objective basis for suspecting the person stopped of criminal activity." United States v. Wright, 582 F.3d 199, 205 (1st Cir. 2009) (citations and quotations omitted). "Th[e] particularity requirement means, in effect, that such a finding must be 'grounded in specific and articulable facts.'" United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007) (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). "The 'objective' component requires courts to 'focus not on what the officer himself believed but, rather, on what a

reasonable officer in his position would have thought.'" Wright, 582 F.3d at 205 (quoting Espinoza, 490 F.3d at 47).

Here, the undisputed facts establish that when Collins and Kiely stopped Foley at about 10:30 p.m., it was reasonable for them to suspect that he was in a restricted area and therefore trespassing. The record indicates that the troopers both believed, reasonably so, that Norumbega closed at dark and that the closing time was indicated by signage at the park.[6]

---

[6]Metropolitan District Commission ("MDC") regulations provide that "[n]o person is allowed on MDC Reservations except during the hours of dawn to dusk unless specified otherwise at the site, or by permit." 350 CMR 2.01(2)(b). We note that there is some question as to whether Norumbega is, in fact, under the jurisdiction of the MDC and whether there were, in fact, signs posted at Norumbega indicating the park's closing time on the day in question. Regardless, we find that it was reasonable for Kiely and Collins to believe that Norumbega, a public park, closed at dark, and that it was signed accordingly. Foley accepts Kiely's statement that at some point there were signs posted at the Norumbega parking lot which indicated that parking after dark was not allowed. But he points to the transcripts of Internal Affairs interviews taken on February 27, 2006, when Kiely and Collins indicated that at some point the signs were removed by vandals. Collins indicated in his interview that he did not recall whether the signs were posted on the night in question, and Kiely was not queried as to whether the signs were there that night.
  While it is possible that the signs could have been removed or vandalized prior to December 4, 2004, it would have been reasonable for the troopers to believe, on the day in question, that the signs were, in fact, posted. Thus, their suspicion that Foley was trespassing was not unreasonable. See Mass. Gen. Laws ch. 266, § 120 ("Whoever, without right enters or remains in or upon the . . . improved or enclosed land . . . of another . . . after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon . . . shall be punished by a fine of not more than one hundred dollars or by imprisonment for thirty days or both such fine and imprisonment.")

-8-

Additionally, the troopers knew that the area was one in which crimes had been reported, including lewd behavior and car break-ins, and they had reason to monitor the MWRA pipes in the area for a potential terrorist threat. While it appears that they had no particular reason to suspect Foley of any such crimes, those circumstances would have reasonably made them more alert to the presence of any individual in the park after dark, particularly one who had already been observed there on two separate occasions, hours before.

The second prong of the inquiry requires us to determine whether the troopers' actions in connection with the stop were reasonable in light of the totality of the circumstances confronting them at the time of the stop. United States v. McCarthy, 77 F.3d 522, 530 (1st Cir. 1996). Here, the troopers asked Foley for identifying information, and after he did not provide his Social Security number, they conducted a warrant check using his name and birthdate. Foley also claims that one or both of the troopers grabbed and/or pushed him, telling him not to leave. When the warrant check turned up an outstanding 1974 Florida warrant for cannabis possession, the troopers continued to detain Foley while they confirmed its validity. Eventually, they handcuffed Foley and transported him to the Framingham barracks. The length of the detention was no longer than one hour.

As we acknowledged in Klaucke v. Daly, 595 F.3d 20 (2010), "most circuits have held that an officer does not impermissibly expand the scope of a Terry stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention." Id. at 26 (citing United States v. Kirksey, 485 F.3d 955, 957 (7th Cir. 2007); United States v. Cavitt, 550 F.3d 430, 437 (5th Cir. 2008); United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008); United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992)). Though we elected in that case not to address whether warrant checks are always permissible in the normal course of a Terry stop, we found that Klaucke's refusal to produce a license when the officer requested it, "reasonably roused a suspicion that his non-cooperation was driven by other considerations, like an outstanding warrant for his arrest or other criminal history . . . ." Klaucke, 595 F.3d at 26. Here, similarly, we find that Foley's inability (or unwillingness) to provide his Social Security number, combined with his initial attempt to avoid contact with the police, provided reasonable grounds for Collins and Kiely to investigate his criminal history.

The fact that the troopers detained Foley for as much as one hour while performing the warrant check is also not problematic, especially as the facts reveal that any delay was largely caused by the troopers' attempts to confirm the warrant's

-10-

validity.[7] "The excessive length of [Foley's] detention arose not because the officers engaged in dilatory tactics, but, instead, because their investigative efforts . . . failed to dispel the suspicion that gave rise to the stop." McCarthy, 77 F.3d at 531 (holding that a seventy-five minute Terry stop was reasonable).

We note that Foley does not argue that the force which he alleges the troopers employed in detaining him violated his constitutional rights. His argument is simply that the troopers lacked a reasonable basis on which to detain him, and as we have discussed above, that argument fails.

## B. Arrest Based on Warrant

Foley next challenges the validity of the Florida warrant as a basis for his arrest, arguing that no warrant ever existed and that the computer print-out produced as evidence of the warrant was generated as part of a cover-up to justify Foley's illegal detention. As we have already discussed, Foley's initial detention was justified by reasonable suspicion separate and apart from the results of the warrant check.

As for the validity of the warrant itself, Mass. Gen. Laws ch. 276, § 23A, provides that "a printout of the electronic warrant from the criminal justice information system ["CJIS"] shall constitute a true copy of the warrant." Thus, the CJIS record of

---

[7]While Foley claims that the warrant was not first discovered until 11:37 p.m., the record indicates otherwise.

the Florida warrant was statutorily sufficient for the troopers to make an arrest.

Moreover, it was reasonable for the troopers to believe that Foley was the individual named in the warrant, as both his name and birthdate matched, and the Social Security number from his BOP record matched the Social Security number listed in the warrant.

As the warrant was valid on its face and matched the identifying information which Foley had provided, Kiely and Collins had probable cause to effectuate the arrest and did not deprive Foley of any constitutional rights in so doing. See Baker v. McCollan, 443 U.S. 137 (1979); Brady v. Dill, 187 F.3d 104 (1st Cir. 1999).

### III. Conclusion

We conclude that in detaining and subsequently arresting Foley, Kiely and Collins did not violate his constitutional rights.

The judgment of the district court is **affirmed**.