# United States Court of Appeals
## For the First Circuit

No. 13-1084

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY SILVA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judges.

Edward J. O'Brien, by appointment of the court, with whom O'Donnell, Trossello & O'Brien, LLP, was on brief for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief for appellee.

February 5, 2014

**TORRUELLA, <u>Circuit Judge</u>.** Anthony Silva was convicted in district court of possessing with intent to defraud counterfeit United States currency in violation of 18 U.S.C. § 472. On appeal, Silva claims that the district court erred in admitting evidence seized by police during and after his arrest, denying his motion for a judgment of acquittal based on the insufficiency of the evidence, and issuing a prejudicial jury instruction on the statutory element of fraudulent intent. Because we find no error in the district court's evidentiary rulings or jury instructions, we affirm.

## I. <u>Facts and Background</u>

### A. <u>Arrest and Search</u>

On July 19, 2010, Daniel Pelletier came to the Derry Police Department to report a complaint against his acquaintance Anthony Silva. Pelletier told Officer O'Donaghue that Silva had just given him $150 in counterfeit currency in exchange for $100 worth of repairs that Pelletier had performed on his car, which Pelletier produced for the officer in a plastic bag. Pelletier related that Silva was producing counterfeit bills as well as counterfeit drivers' licenses, and that Silva had $300 to $400 more in counterfeit currency in a white Sovereign Bank envelope. He also reported that Silva was living out of his silver Cadillac sedan, in which Silva kept all of his belongings and was currently parked in a lot at 25 Linlew Drive. Asked why he had come forward

-2-

with this information, Pelletier informed O'Donaghue that he had been "burned" by Silva in past business transactions and was "fed up" with his behavior.

Although O'Donaghue was unaware of it at the time, this was not the first time that Pelletier had complained to the Derry Police Department regarding alleged incidents. Over the previous years, Pelletier had contacted the police on numerous occasions, claiming to have been cheated out of the ownership of several gas stations. In 2010, he claimed to have been beaten by six unidentified men and reported a break-in into his home. None of the ensuing investigations yielded any evidence corroborating Pelletier's claims. Pelletier would also later claim to have won ten million dollars in the lottery in 2005, although in fact he currently lives with his mother and has shown no evidence of receiving such winnings.

In response to Pelletier's report, Sergeant Muncey and Officer Phillips of the Derry Police were dispatched to 25 Linlew Drive. As reported by Pelletier, the officers observed a silver Cadillac sedan full of personal belongings, occupied by a shirtless man sitting in the driver's seat. Muncey and Phillips approached the car and asked the individual for his driver's license. When the individual refused to produce his license, Muncey threatened to arrest him for failing to comply with an order from a policeman. The individual subsequently produced a New Hampshire driver's

license identifying him as Anthony Silva. Based on that license, Phillips radioed in Silva's information and was informed by the dispatcher that Silva had an outstanding bench warrant for an unpaid motor vehicle fine.

Acting on Silva's outstanding warrant, the officers ordered him to exit the car and placed him under arrest. When they conducted a search of his person incident to arrest, the officers found a fake New York driver's license with Silva's photograph, as well as $20 and $10 bills that Phillips believed to be counterfeit based on their texture, coloring, and missing watermarks. After Silva was taken to the police station, he waived his Miranda rights and told the officers that he must have obtained the counterfeit bills during a transaction at a nearby Walmart or gas station. He refused to give the police consent to search his car.

In the absence of consent, the police arranged to have Silva's car towed to the police station. The officers did not immediately search the car, instead assigning Detective Muise to apply for a search warrant. That afternoon, Muise spoke with Pelletier "in order to gain probable cause" for the search warrant. Pelletier informed the detective that Silva had called him following his arrest and lamented that he was "screwed" because he had $3,000 worth of counterfeit bills in his trunk.

Because Silva's arrest involved counterfeiting of United States currency, the Derry prosecutor passed the case to the Secret

Service.  Muise shared the information she had collected on Silva with Special Agent Brian Coffee, including Pelletier's initial report and her follow-up conversation.  It is unclear whether she knew or shared information about Pelletier's history of false reports.  Coffee submitted an application for a search warrant that included Pelletier's accusations against Silva, but no information regarding Pelletier's mental health or his personal antipathy towards Silva.  Coffee wrote that Pelletier's information was "trustworthy and reliable."  After a warrant was executed, Secret Service agents discovered $2,880 in counterfeit money, a copier/scanner, and a paper cutter in the trunk, as well as $200 in counterfeit money in the glove compartment.

**B.  Trial**

The government charged Silva with possession with intent to defraud of counterfeit United States currency in violation of 18 U.S.C. § 472.  Before trial, Silva moved to suppress any evidence discovered during his arrest and the subsequent search of his car. He further moved to invalidate the search warrant for his car on the basis that Coffee's application concealed material facts bearing on Pelletier's credibility.  The district court denied the motion to suppress and, after holding a <u>Franks</u> hearing on the matter of the warrant, denied Silva's motion to invalidate.

At trial, the prosecution presented substantially the same information described above, as well as evidence that the

-5-

serial numbers on Silva's counterfeit bills matched the numbers on counterfeit bills recently passed in nearby towns. After the presentation of evidence, Silva moved for a judgment of acquittal based on insufficient evidence to establish the statutory element of intent to defraud. The district court denied the motion. During the charging conference, it proposed the following jury instruction with respect to that element:

> Because it is impossible to know a person's intentions or subjective beliefs, the government need not directly prove the defendant's intent to defraud another person. Rather, it may prove his intent by circumstantial evidence. That is to say, you may infer the defendant's intent from the surrounding facts and circumstances. So, for example, in determining whether the defendant had the requisite intent to defraud, you may consider things such as whether he possessed a substantial number and/or variety of counterfeit Federal Reserve Notes. You may also consider whether those counterfeit Federal Reserve Notes were of such a quality that they would be likely to be accepted in a transaction since the more closely counterfeit Notes resemble genuine currency, the more likely you might find that the defendant intended to use those Notes fraudulently to receive goods or services.

Silva challenged the proposed instruction on the grounds that the court's references to the amount of currency as potential evidence of intent endorsed the government's theory of proof. The court overruled the objection.

The jury returned a conviction on the charge of possession with intent to defraud. Silva now appeals to this court.

## II. <u>Discussion</u>

With the exception of Silva's challenge to the jury instructions, which are reviewed for abuse of discretion, <u>United States</u> v. <u>Sasso</u>, 695 F.3d 25, 29 (1st Cir. 2012), we review Silva's challenges to the admissibility of seized evidence and the judgment of acquittal <u>de novo</u>. <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 699 (1996) (holding that reasonable suspicion and probable cause determinations are reviewed <u>de novo</u>); <u>United States</u> v. <u>Grace</u>, 367 F.3d 29, 34 (1st Cir. 2004) (reviewing sufficiency of the evidence determinations <u>de novo</u>). We review the district court's factual findings only for clear error. <u>United States</u> v. <u>Wright</u>, 582 F.3d 199, 205 (1st Cir. 2009).

## A. The Investigative Stop

Silva alleges that the Derry police officers violated his Fourth Amendment right when they seized him at 25 Linlew Road based on Pelletier's allegedly unreliable complaint. The parties do not dispute that the police officers "seized" Silva when they approached his car and demanded his driver's license. The only question is whether the officers had a reasonable suspicion of criminal activity sufficient to justify their actions.

Under the Supreme Court's precedent in <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968), a police officer may perform "a brief investigatory stop of an individual if the officer has a reasonable suspicion that criminal activity may be afoot." <u>United States</u> v. <u>Am</u>, 564 F.3d 25, 29 (1st Cir. 2009); <u>see also</u> <u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 273 (2002) ("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.") (internal quotation marks and citation omitted). A permissible investigatory stop must satisfy two requirements:

First, the police officer "must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity." <u>United States</u> v. <u>Ruidíaz</u>, 529 F.3d 25, 28 (1st Cir. 2008). A reasonable suspicion of criminal activity requires some "particularized and objective basis" for suspecting a stopped individual of legal wrongdoing. <u>United States</u> v. <u>Pontoo</u>, 666 F.3d 20, 27-28 (1st Cir. 2011) (quoting <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417 (1981)). It entails "more than a mere hunch but less than probable cause." <u>Ruidíaz</u>, 529 F.3d at 29. The First Circuit recognizes that reasonable suspicion sufficient to justify a <u>Terry</u> stop may arise when "presumptively reliable information about criminal activity is provided by third parties." <u>Id.</u>

Second, the officer's "actions undertaken pursuant to that stop must be reasonably related in scope to the stop 'unless

-8-

the police have a basis for expanding their investigation.'" Id. at 28-29 (quoting Unites States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006)). It is well settled that a police officer conducting an investigatory stop may request the stopped individual to produce identifying information. "Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty., 542 U.S. 177, 185 (2004). Where circumstances give officers reasonable grounds to suspect that a defendant may have a criminal history, they may also run a routine background and warrant check without exceeding the scope of an investigatory stop. Klaucke v. Daly, 595 F.3d 20, 26 (1st Cir. 2010); Foley v. Kiely, 602 F.3d 28, 33 (1st Cir. 2010).

At the time Officers Muncey and Phillips approached Silva, they had received information from a third party alleging that Silva was producing and in possession of counterfeit currency. The officers who received Pelletier's complaint had no knowledge of Pelletier's prior eccentricities that may have led them to question the reliability of his account. Pelletier's accusations were corroborated by the fact that he produced an exemplar of counterfeit currency allegedly handed to him by Silva, as well as by the officers' own observations of Silva's car at 25 Linlew Road. Even if Pelletier's account would not have provided "probable

-9-

cause" for a full-scale search of Silva and his vehicle, the partially corroborated complaint created a "reasonable suspicion" sufficient to justify the police's actions in approaching Silva and requesting basic identification.  At that point, Silva's refusal to provide his driver's license -- coupled with Pelletier's specific allegations that Silva was producing counterfeit identification -- gave police officers reasonable grounds to run a routine warrant check on his license.  See Klaucke, 595 F.3d at 26 ("[Defendant's] refusal to produce a license . . . reasonably roused a suspicion that his non-cooperation was driven by other considerations, like an outstanding warrant for his arrest . . . ."); Foley, 602 F.3d at 33 ("[Defendant's] inability (or unwillingness) to provide his Social Security number, combined with his initial attempt to avoid contact with the police, provided reasonable grounds . . . to investigate his criminal history.").

The district court did not err in admitting evidence seized on Silva during the arrest ensuing from the officers' investigative stop.

**B.  The Seizure of the Car**

Second, Silva argues that the Derry police lacked probable cause to seize his vehicle following his arrest.  He insists that Pelletier's history of delusional reports undermined the credibility of his information, and that the police's attempts to obtain further information for a search warrant prior to

actually searching the car demonstrate their lack of probable cause at the time of seizure.

Under the "automobile exception" to the Fourth Amendment, police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband. Robinson v. Cook, 706 F.3d 25, 31-32 (1st Cir.), cert. denied, 133 S. Ct. 2831 (2013); see also Florida v. White, 526 U.S. 559, 563-64 (1999) ("[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.").

Probable cause exists when "the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." Robinson, 706 F.3d at 32; see also Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) ("A police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." (alteration in original) (internal quotation marks omitted)). The standard is satisfied when the totality of the circumstances create "a fair probability that . . . evidence of a crime will be found in

-11-

a particular place." United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009) (internal quotation mark and citation omitted).

In this case, the record suggests that at the time the police seized Silva's vehicle they had ample evidence supporting a finding of probable cause for a search. After the officers discovered Silva's outstanding warrant, their search incident to arrest yielded several counterfeit bills and a counterfeit driver's license in Silva's wallet. The seized material corroborated Pelletier's complaint, in which Pelletier had insisted that Silva was producing both counterfeit currency and counterfeit identification. Furthermore, the officers' observations of Silva's car, which suggested that the defendant was currently living out of the vehicle, gave them reason to believe that further evidence of counterfeiting might be found inside the vehicle. Together with Pelletier's initial report, which alleged that Silva had an additional $300 of counterfeit bills in his glove compartment, this evidence more than sufficed to suggest there existed a "fair probability" that searching Silva's car would lead officers to further contraband.

Silva insists that the officers' decision to forestall searching his car until they had obtained a proper warrant reveals their own doubts as to whether they had probable cause at the time of seizure. Setting aside the fact that the officers' procedural diligence in obtaining a warrant hardly proves their subjective

uncertainty about the quality of their evidence, Silva's argument misreads the law of probable cause. In evaluating probable cause, a court looks "at the objective facts, not at the actors' subjective intent." United States v. Sánchez, 612 F.3d 1, 6 (1st Cir. 2010). Consequently, an officer's subjective belief that he or she lacked probable cause is not dispositive where the facts support an objective finding that the standard has been satisfied. See United States v. Pardue, 385 F.3d 101, 106 n.2 (1st Cir. 2004) ("Although [the police officer's] testimony . . . calls into doubt whether he believed that the information about throwing the lighter amounted to probable cause, . . . an officer's subjective belief is not dispositive of whether probable cause existed."). The practice of awaiting a magistrate's warrant prior to conducting a search, even where officers feel confident in their own assessment of probable cause, is one that should be commended, not punished with exclusion.

The district court properly found that the police had probable cause to seize Silva's vehicle following his arrest.

## C. The Warrant Application

Third, Silva argues that Agent Coffee's failure to include Pelletier's history of delusional complaints or his self-identified animus against Silva in the warrant application, both of which may have undermined the magistrate's finding of probable cause, renders the ensuing warrant and search of Silva's car

invalid. Silva insists that Coffee's failure to note Pelletier's potential motives to fabricate evidence, as well as his entirely speculative assertions that Pelletier was "trustworthy and reliable," constituted a reckless disregard for truth or falsity.

A defendant who seeks a Franks hearing to suppress evidence obtained through an invalid warrant must make two showings. First, the defendant must show that the warrant application included a "false statement or omission . . . [that] was made knowingly and intentionally or with reckless disregard for the truth." United States v. Rigaud, 684 F.3d 169, 173 (1st Cir. 2012); see also Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (requiring "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit"). An omission of material fact is sufficient to trigger a hearing. United States v. Reiner, 500 F.3d 10, 14 (1st Cir. 2007).

Furthermore, a defendant must show that the identified falsehood or omission "was necessary to the finding of probable cause." Rigaud, 684 F.3d at 173; see also Franks, 438 U.S. at 156. Consequently, evidence procured through a challenged warrant may be suppressed at a Franks hearing "only if the warrant application, cleansed of any false information or clarified by disclosure of previously withheld material, no longer demonstrates probable

cause." United States v. Stewart, 337 F.3d 103, 105 (1st Cir. 2003). Probable cause to issue a warrant exists when, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Reiner, 500 F.3d at 15 (omission in original) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

The analysis of probable cause in the foregoing section is sufficient to dispose of Silva's challenge with regard to his Franks hearing. When the police seized Silva's vehicle, they already had ample evidence to obtain a warrant, including Pelletier's partially corroborated complaints, police officers' own observations, and the counterfeit bills and driver's license found in Silva's wallet. By the time he applied for the warrant, Agent Coffee additionally had the benefit of Pelletier's report that Silva claimed to have $3,000 worth of counterfeit currency in his car trunk. While Silva objects to Coffee's omission of Pelletier's past history of false reports, the district court properly found that the disclosure of this additional information would not have undercut the magistrate's finding of probable cause. Much of Coffee's most damning evidence, including the actual counterfeit bills, existed independently of Pelletier's statements. Furthermore, several of Pelletier's predictive statements about Silva's involvement with counterfeit goods had been corroborated by the officers' arrest, lending credibility to his other statement.

Finally, as the district court noted, Silva has produced no evidence suggesting that Coffee's omission of the evidence was "intentional" or even "reckless."  Aside from potentially Officer Muise, there is no evidence that any of the officers involved with the investigation had any knowledge of Pelletier's history, nor that they shared this history with Coffee.

The district court properly denied Silva's motion to suppress.

## D.  Sufficiency of the Evidence

Fourth, Silva argues that the trial court erred in denying his motion for a judgment of acquittal based on the government's lack of evidence establishing his "intent to defraud" under 18 U.S.C. § 472.  Specifically, Silva insists that mere possession of counterfeit currency cannot establish an intent to deceive third parties and that his admission to Pelletier that the bills were counterfeit undercuts any deceptive intentions on his part.

Under 18 U.S.C. § 472, anyone who "with intent to defraud . . . keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined . . . or imprisoned not more than 20 years, or both."  18 U.S.C. § 472.  To convict a defendant of possession under the act, the government must demonstrate that (1) the defendant possessed a bill which was (2) counterfeit and that

-16-

(3) the defendant "intended to use the false bill to defraud." United States v. Mousli, 511 F.3d 7, 14 (1st Cir. 2007). Where a defendant merely possesses counterfeit currency, rather than passes or produces it, fraudulent intent "may be inferred from surrounding circumstances or circumstantial evidence and thus need not be proven directly." Id. at 16. A "general intent to defraud third parties" is sufficient to sustain a conviction under 18 U.S.C. § 472. United States v. Parr, 716 F.2d 796, 819 (11th Cir. 1983) (Roney, J., concurring in part and dissenting in part); see also, e.g., United States v. Marshall, 179 F. App'x 516, 518 (10th Cir. 2006); United States v. Baker, 650 F.2d 936, 937 (8th Cir. 1981); United States v. Wyatt, 611 F.2d 568, 570 (5th Cir. 1980).

The district court properly denied Silva's motion for a judgment of acquittal. Silva suggests that the prosecution failed to present any credible evidence of his intent to defraud because, in the course of his only transaction involving the counterfeit currency, Silva openly informed Pelletier that the bills were false; consequently, the only evidence from which a jury may have inferred his fraudulent intent was possession of the false currency itself. This theory is patently false. Aside from Silva's possession of the currency, the prosecution demonstrated that Silva had tendered Pelletier the counterfeit currency in satisfaction of a genuine debt arising from a business transaction. While Silva openly admitted that the bills were counterfeit, he also offered

-17-

Pelletier a substantially higher amount of counterfeit bills than his initially bargained-for debt. Silva's exchange with Pelletier lends itself to an obvious inference that Silva offered Pelletier the counterfeit bills for future use in third-party transactions, intentionally injecting his false currency into the stream of commerce. These facts support a finding that Silva acted with a general intent to deceive third parties. Furthermore, Agent Coffee testified at trial that the serial numbers on false bills found in Silva's car matched the serial numbers on false bills recovered in several nearby businesses, supporting an inference that Silva had previously passed the bills in commercial transactions.

Based on the submitted evidence, the district court did not err in submitting the question of Silva's fraudulent intent to a jury.

## E.  The Jury Instructions

Finally, Silva argues that the district court's jury instructions, identifying the quantity of a defendant's counterfeit currency as potential evidence of a defendant's intent to defraud, unfairly prejudiced the jurors in favor of the government.

Where a party challenges the trial court's jury instructions, this court reviews de novo "whether the instructions conveyed the essence of the applicable law" and reviews for abuse of discretion "whether the court's choice of language was unfairly prejudicial." Sasso, 695 F.3d at 29; accord DeCaro v. Hasbro,

Inc., 580 F.3d 55, 61 (1st Cir. 2009). "It is unquestioned that, when instructing a jury, a judge 'may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles.'" United States v. Hernández, 490 F.3d 81, 84 (1st Cir. 2007) (quoting United States v. Maguire, 918 F.2d 254, 268 (1st Cir. 1990)); accord United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009); see also United States v. Valdivia, 680 F.3d 33, 44 (1st Cir.), cert. denied, 133 S. Ct. 565 (2012) (approving the "use of evidentiary exemplars from the body of existing trial evidence to illustrate the meaning of" legal principles).

The jury instructions issued in this case were neither incorrect on the law nor unfairly prejudicial in favor of the government. This court has previously recognized that a defendant's possession of a large amount of counterfeit currency supports an inference that the defendant possessed the currency with a future intention of use. See Mousli, 511 F.3d at 16 ("The number and variety of bills also suggest that Mousli was engaged in an ongoing effort to produce and refine fake currency with the intent of using it."). The judge's instructions in this case were thus entirely accurate. While Silva suggests that the judge's decision to single out the amount of currency was unfairly prejudicial because the prosecution's case relied precisely on this form of evidence in establishing Silva's fraudulent intent, the judge's decision in

this regard accorded with his recognized legal prerogative to incorporate available evidence into jury instructions so as to clarify the governing legal standard for the jury. As the government notes, the judge did not seek to analyze or interpret the government's specific evidence, nor did he opine on whether the amount of counterfeit currency possessed by Silva rose to the threshold of establishing an inference of fraudulent intent. The jury instructions did not constitute an abuse of discretion by the district court.

### III. Conclusion

For the foregoing reasons, the district court's decision is affirmed.

**Affirmed.**