# United States Court of Appeals
## For the First Circuit

No. 15-1841

UNITED STATES OF AMERICA,

Appellee,

v.

GYADEEN P. RAMDIHALL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Angela G. Lehman for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

May 18, 2017

**BARRON, Circuit Judge**.  Gyadeen P. Ramdihall appeals his conviction for conspiracy to commit access-device fraud in violation of 18 U.S.C. § 1029(a)(1), (a)(3), and (b)(2), and 18 U.S.C. § 371.  On appeal, Ramdihall challenges the District Court's denial of his pretrial motion to suppress evidence.  We affirm.

## I.

Ramdihall, along with his co-defendant, Jervis A. Hillaire, was indicted in federal court in the District of Maine on February 25, 2014, for conspiracy to possess and use counterfeit access devices with intent to defraud, as well as for five related counts.  See 18 U.S.C. § 1029(a)(1), (a)(3), and (b)(2); id. § 371.  Before their trial on those counts in federal court, Hillaire and Ramdihall submitted motions to the District Court to suppress evidence and statements that had been obtained in the previous months in connection with three traffic stops: a September 6, 2013 stop in Kittery, Maine; an October 10, 2013 stop in Ohio; and a January 24, 2014 stop in Biddeford, Maine.

After a two-day suppression hearing, the District Court issued an oral order denying the motions to suppress.  Ramdihall then conditionally pled guilty to conspiracy to possess and use counterfeit access devices in violation of 18 U.S.C. § 1029(a)(1) and (a)(3), preserving his right to challenge the District Court's

ruling on his motion to suppress.[1]  He was sentenced to 10 months' imprisonment and three years' supervised release.  He was also ordered to pay $17,987.56 in restitution.

On appeal, Ramdihall challenges the District Court's denial of his motion to suppress in connection with any evidence and statements obtained from only two of the stops: the September 6, 2013 stop in Kittery, Maine, and the October 10, 2013 stop in Ohio.  We address his challenges concerning each stop in turn.

**II.**

We begin with Ramdihall's challenge to the denial of his motion to suppress concerning the September 6, 2013 stop in Kittery, Maine.  Ramdihall contends that the police, in the course of this encounter, effected a seizure within the meaning of the Fourth Amendment, even though the police lacked the constitutionally required basis for doing so.  Accordingly, he contends that the fruits of that unlawful seizure, including evidence obtained from the search of the trunk of the vehicle he was driving, must be suppressed.

There is no dispute that a seizure did occur at some point.  Nor is there any dispute that, in light of the investigative nature of that seizure, the government could effect

---

[1] Hillaire also conditionally pled guilty to conspiracy to possess and use counterfeit devices in violation of 18 U.S.C. § 1029(a)(1) and (a)(3).

- 3 -

it so long as the government had reasonable suspicion that criminal activity was afoot.  See Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (holding warrantless investigative stops constitutionally permissible where law enforcement officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"); United States v. Brignoni-Ponce, 422 U.S. 873, 880-81 (1975) (extending Terry to vehicle searches).  So, the key questions are whether the police had such suspicion at the time of the initial seizure and whether the police continued to have a lawful basis for effecting the seizure as it persisted.  For, if the police did, then the seizure was lawful and there would be no illegal fruits to suppress.

We start by describing the facts relevant to the suppression ruling at some length, taking them from the District Court's uncontested findings and the officers' testimony from the suppression hearing.  See United States v. Campa, 234 F.3d 733, 737 (1st Cir. 2000) (explaining that we "uphold a district court's decision to deny a suppression motion if the decision is supported by any reasonable view of the evidence").  We then consider the basis for the initial seizure, before turning to consider the basis for it as it continued.  Finally, we address Ramdihall's additional contention that, even if the seizure was lawful, the District Court erred in refusing to suppress the evidence obtained from the search

- 4 -

of the car's trunk, as Ramdihall contends that the District Court erred in concluding that Ramdihall voluntarily consented to that search.

**A.**

The facts concerning the Kittery traffic stop are as follows. At approximately 1:30 a.m. on September 6, 2013, John Brosnihan, a patrol officer for the Kittery Police Department, was sitting in a parked, marked police car near a 7-Eleven in Kittery, when a 7-Eleven employee approached. The employee told Brosnihan that he was concerned about people in the 7-Eleven who were buying thousands of dollars' worth of gift cards with other gift cards. The employee identified the car in the parking lot that belonged to the people buying the gift cards.

In response, Brosnihan contacted police dispatch and requested that dispatch run the plate number of that car. He then approached the passenger's side of the car, using his flashlight to look inside. Inside the car were Ramdihall, in the driver's seat, and Hillaire, in the passenger's seat. A second officer arrived on the scene shortly thereafter.

Brosnihan asked Hillaire if a woman whom Brosnihan could see inside the 7-Eleven and whom he pointed out to Hillaire was with Hillaire. Hillaire said that the woman was with him. Brosnihan then asked if Hillaire knew what the woman was doing inside the 7-Eleven, and Hillaire said he did not know. Brosnihan

- 5 -

then asked, more specifically, if Hillaire "knew anything about gift cards, buying gift cards with gift cards," and Hillaire denied that he knew anything about using gift cards to buy gift cards. Brosnihan saw some electronic devices in boxes in the car located at Hillaire's feet. Brosnihan then went around the car and approached Ramdihall, who was in the driver's seat, and asked what he was doing at the 7-Eleven.

Ramdihall said that he had stopped to get gas. He could not explain, however, why he had not yet gotten gas and why the car was not stopped at a gas pump. Ramdihall, too, denied knowing anything about the gift cards when Brosnihan asked him about them.

Brosnihan then asked for identification from both Ramdihall and Hillaire. Ramdihall produced a New York driver's license. Hillaire produced a "California ID."

Brosnihan asked to whom the car -- which had Tennessee plates -- belonged. Hillaire stated that the car was a rental that he had received as a birthday gift from his cousin. Hillaire also stated that he was a "co-renter."[2] At some point, Brosnihan saw the rental agreement and learned that neither Hillaire's name

_____

[2] At the suppression hearing, Ramdihall submitted an affidavit stating that the individual whose name actually was on the rental agreement -- Nadege Butler -- had given her brother permission to use the car, and that with permission from both Butler and her brother, Ramdihall drove it to Maine. The District Court gave "very little credence" to this explanation, in light of what the District Court found was the inconsistent story Hillaire provided during the stop.

nor Ramdihall's name was on the rental agreement. The record is not clear, however, as to precisely when Brosnihan saw the rental agreement.

When the woman inside the 7-Eleven -- later identified as Vegilia O'Connor -- exited to return to the car, Brosnihan stopped her to ask about the gift card purchases. O'Connor explained to Brosnihan that she had received the gift cards that she was using to purchase gift cards from a friend so that she could go school shopping for her kids, and that she was using the gift cards to buy new gift cards because the ones that she had sometimes did not work. She also stated that she had left New York around 4:00 p.m. that same day to travel to Maine to shop. However, she could not explain why she had left so late that she would arrive in Maine at a time when stores were closed. She said they had been shopping at "some outlets" that she could not name, and she said that those outlets were about 30 minutes away.

Brosnihan then questioned Hillaire and Ramdihall separately, outside of the car. Both said they were in Maine to shop, but neither could name the stores at which they had been shopping. Hillaire said they had shopped for an Apple laptop in Brunswick, Maine, which he said was a 40-minute drive from Kittery. Ramdihall could not say where they had shopped, but he said the place they had shopped was about 15 minutes away from Kittery.

Then, at 1:45 a.m., Brosnihan's supervisor, Sergeant Gary Eaton, arrived on the scene. About ten minutes later, at 1:55 a.m., a detective was called to the scene, due to the officers' unfamiliarity with how to handle an investigation into possible fraud, which Brosnihan had begun to suspect might be afoot in consequence of the evidence concerning gift card purchases. At that point, Eaton made the internal decision that the three individuals would not be allowed to leave until the detective that had been called had arrived.

The officers then asked each individual about what, if anything, was in the trunk of the car. Originally, each said there was nothing in the trunk. Later, Hillaire and O'Connor each said there was a laptop computer in the trunk, but each said that it belonged to the other. O'Connor overheard Hillaire tell Brosnihan that the laptop computer belonged to her, and interjected to deny that it belonged to her.

Brosnihan then asked Ramdihall again what was in the trunk. Ramdihall said he did not know. According to Brosnihan's testimony at the suppression hearing, Brosnihan asked, "[D]o you mind if I take a look?," and Ramdihall responded, "[B]e my guest." Brosnihan then said, "[A]re you sure?," to which Ramdihall again responded, "[B]e my guest."

Inside the trunk was, among other things, "a lot of computer equipment," including MacBooks, MacBook Pros, iPads, and

- 8 -

iPad Minis. Hillaire said that one of the MacBook computers belonged to him. When Brosnihan asked to see a receipt for the computer, Hillaire initially said he had an e-mail receipt on his cell phone but did not want to show it to Brosnihan. Later, Hillaire claimed to have thrown away the receipt. Brosnihan asked the three individuals multiple times to whom the other equipment belonged. No one claimed ownership of any of the other items. At that point, Brosnihan seized the items and then let the three individuals go.

Throughout the encounter, other law enforcement officers came and went as well. The District Court found, and the parties do not contest, that there were three police officers on the scene as of 1:45 a.m., two more by 2:32 a.m., and six in total by 2:42 a.m. The District Court also found that, throughout the encounter, "[t]here were never any handcuffs, no drawn weapons, no aggressive questioning, no physical restraint."

**B.**

With respect to when the seizure occurred and what the basis for it was at the time that it occurred, the District Court found as follows. It determined that, "giv[ing] the defendants the benefit of the doubt," the encounter -- which had begun at approximately 1:30 a.m. and lasted nearly until 3 a.m. -- became

a seizure at approximately 1:55 a.m.[3]  The District Court also found that, by 1:55 a.m., the police had reasonable suspicion to believe that criminal activity was afoot and thus to effect the seizure in accord with the Constitution.  The District Court based this conclusion on the following facts:

- "the store clerk had told Brosnihan about his and the other clerk's concern about a group of people from a car with Tennessee plates using gift cards to purchase other gift cards involving thousands of dollars at the 7-Eleven in the wee hours of the morning";

- the car occupants were unable to "give plausible or consistent explanations during the initial encounter";

- "Ramdihall said they were there to buy gas, but he had no explanation [as] to why he parked in front of the store rather than at the gas pumps";

- "Hillaire said he was a co-renter of the car, but his name was not on the rental agreement, nor was Ramdihall's";

---

[3] By that time, there were three officers at the scene.  That was also the time when Eaton called a detective and made the internal decision not to let the defendants leave until the detective arrived, though, as the District Court correctly noted, Eaton's subjective, internal decision not to let the defendants leave until the detective arrived is not determinative, as the critical question is whether the individual being questioned would reasonably feel free to end the encounter.  Florida v. Bostick, 501 U.S. 429, 434 (1991).

- 10 -

- "[s]ome of them couldn't name the stores in which they shopped or where they were located";

- "they gave different accounts of the distance"; and

- their explanation "of coming to Maine to shop at that time of night" was dubious.

We review the District Court's findings of fact and credibility determinations for clear error. United States v. Tiru-Plaza, 766 F.3d 111, 114 (1st Cir. 2014). "Under this clear-error review, we grant significant deference to the district court, overturning its findings only if, after a full review of the record, we possess a definite and firm conviction that a mistake was made." Id. at 115 (citation omitted). We review de novo the District Court's legal conclusions, including its determinations as to whether there was reasonable suspicion and its ultimate decision to grant or deny the motion to suppress. Id.

Ramdihall argues that the District Court erred in finding that the seizure did not occur until 1:55 a.m. He contends that the record shows that the seizure actually occurred at the time of Brosnihan's initial encounter with Ramdihall and Hillaire at approximately 1:30 a.m. and that the seizure then persisted up to and past 1:55 a.m., because, upon initially encountering the two men while they were seated in the parked car, "Brosnihan took Ramdihall's driver's license and the reasonable inference is that

it was in police custody at least until [the detective], who was the last to arrive at 2:30, took pictures of the license."[4]

Ramdihall does not challenge the District Court's finding that it was "unremarkable" that Brosnihan inspected Ramdihall's driver's license during the initial encounter and that such inspection did not itself transform the encounter into a seizure. See United States v. Himes, 25 F. App'x 727, 730 (10th Cir. 2001) (finding no seizure where police officer "got the license, ran a check on the license, asked [the defendant] to get out of the Jeep, and then returned the license" because the officer's possession of the license was "sufficiently brief"). Rather, he appears to contend only that the initial, unremarkable, inspection of the license was transformed into a seizure at some point prior to 1:55 a.m. but after the initial inspection because, after Brosnihan reviewed the license, he then retained it and did not return it until sometime after 2:30 a.m. And Ramdihall argues

---

[4] Ramdihall also argues that the officers did not have reasonable and articulable suspicion at 1:55 a.m. -- the time that the District Court found the seizure occurred -- because Brosnihan and the other officers had not actually observed Ramdihall or his associates do anything unlawful. But, our case law does not require that an officer observe actual unlawful activity in order to effect a seizure. He need only have reasonable suspicion that criminal activity may be afoot. Thus, "we have upheld Terry stops where the combination of 'innocuous' facts culminates in reasonable suspicion." United States v. Wright, 582 F.3d 199, 212 (1st Cir. 2009). Indeed, in Terry itself, the detention was occasioned by an officer's observation of "unusual," not unlawful, conduct. 392 U.S. at 30. Thus, insofar as the seizure did occur at 1:55 a.m., Ramdihall's challenge fails.

that we may reasonably infer that the license was not returned until 2:30 a.m. because it was at that time that, the record shows, police made a copy of the license.

But Ramdihall never argued below that the license was retained at all, let alone until 2:30 a.m.  Assuming his argument about the seizure of his license has not been waived -- and the government makes no argument that it has been -- there must still exist a basis in the record for concluding that the license was retained.  But, there is no finding to that effect by the District Court, as Ramdihall never raised the issue he now presents to us.  Nor is there any finding about when the license was returned or the circumstances regarding its possible retention.  And, in the absence of express findings by the District Court, we must view the record evidence in the light most favorable to the District Court's ruling.  Tiru-Plaza, 766 F.3d at 117 n.10.  We therefore see no basis on this record for concluding that the license was retained by police from the time of the initial encounter until past 1:55 a.m.  Thus, even if we were to conclude that the extended retention of a license may suffice to effect a seizure,[5] Ramdihall's contention would fail to persuade.

---

[5] See United States v. Miller, 589 F.2d 1117, 1127 (1st Cir. 1978) ("Appellant could not lawfully operate his vehicle without [his license and registration]. He was not free to go."); see also United States v. Weaver, 282 F.3d 302, 311 (4th Cir. 2002) (retention of a driver's license during a traffic stop may create

- 13 -

Ramdihall does attempt to counter the District Court's finding about when the seizure began by arguing that "Brosnihan testified that early in the encounter he would not have allowed the men to leave." But while Brosnihan did testify that he had decided, by the end of the encounter, that Ramdihall was not free to leave without permission, Brosnihan said nothing about making that decision "early in the encounter," as Ramdihall contends.

Ramdihall also attempts to support his argument that the seizure occurred prior to 1:55 a.m. by noting, "Eaton testified that he decided the men would not be allowed to leave until the detective arrived." But, the fact that the record shows that Eaton had made that decision at 1:55 a.m. obviously does not help Ramdihall show that a seizure had taken place before that time.

Finally, Ramdihall appears to contend that the District Court erred in finding that the seizure did not occur until 1:55 a.m. because the number of police officers present over the course of the encounter converted it into a seizure by creating "a coercive and intimidating situation" prior to that time. Ramdihall notes in this regard that over the course of the entire encounter, six officers were present, and that "[t]he number and position of officers have been recognized as important considerations for

a seizure); United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997) (same); United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997) (same); United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983) (same).

- 14 -

determining whether an atmosphere of restraint can be said to have existed." United States v. Berryman, 717 F.2d 651, 655 (1st Cir. 1983), rev'd en banc, 717 F.2d 650 (1st Cir. 1983). But, the fact that, over the course of the entire encounter (which lasted until well after 3 a.m.), six officers were present provides no basis for finding that the District Court erred in finding that the seizure did not occur until 1:55 a.m. See United States v. Mendenhall, 446 U.S. 544, 554 (1980) (recognizing that "the threatening presence of several officers" "might indicate a seizure" but finding no seizure where two federal law enforcement agents approached and questioned the defendant).[6]

## C.

Ramdihall next turns to his fallback argument that, even if the police had reasonable suspicion sufficient to justify the investigative stop as of 1:55 a.m., the Kittery stop was unreasonably long and thus became an unconstitutional seizure as it progressed. The District Court found that, "although the stop here was lengthy, . . . it was not too long under all the circumstances." The District Court reached this conclusion based on its finding that the length of the stop was proportional to the law enforcement purposes of the stop and the time reasonably needed

---

[6] Ramdihall seems to make the additional argument that he and Hillaire were targeted because they were black men. But, Ramdihall makes this argument for the first time on appeal, and so must show plain error. And he makes no developed argument in this regard.

to effectuate those purposes.  We review the District Court's conclusion de novo, and its factual findings for clear error. Tiru-Plaza, 766 F.3d at 114-15.

As the Supreme Court has explained, "obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." United States v. Sharpe, 470 U.S. 675, 685 (1985).  And, at that point, the government can no longer justify the seizure merely with reasonable suspicion that criminal activity is afoot.  Nevertheless, "our cases impose no rigid time limitation on Terry stops."  Id.; see also United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) ("[T]here is no talismanic time beyond which any stop initially justified on the basis of Terry becomes an unreasonable seizure under the [F]ourth [A]mendment." (first alteration in original) (citation omitted)).  Rather, we must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Sharpe, 470 U.S. at 685.

The seizure here lasted for 82 minutes, from 1:55 a.m. until Ramdihall and his associates were released at 3:17 a.m.  That amount of time is lengthy.  But, Ramdihall must show that the 82-minute seizure was longer than reasonably needed to investigate the possible illegal activity, as the purpose of the stop was to permit such an investigation.  Ramdihall fails to do so.  In fact, he does not contest the District Court's findings that

"circumstances remained murky; there were no obvious or alternative ways to investigate; [and] the suspects were from away [New York] and were leaving the state with possibly fraudulently obtained merchandise and gift cards." Thus, the argument that the seizure was unreasonably long fails. See United States v. McCarthy, 77 F.3d 522, 531 (1st Cir. 1996) (finding 75-minute Terry stop was not "particularly unreasonable" because "[t]here is no evidence or even an allegation of less than diligent behavior on the part of the police," and "[t]he officers on location used a number of different investigative techniques in their efforts to pursue quickly any information that might have dispelled the reasonable suspicion that initially triggered the stop").

**D.**

Ramdihall's final argument for suppressing the evidence obtained from the traffic stop in Kittery is that, even if the seizure was lawful, the District Court erred in denying the aspect of the suppression motion that contended that Ramdihall had not voluntarily given his consent to the search of the trunk. We review the District Court's voluntariness finding for clear error, United States v. Kimball, 741 F.2d 471, 474 (1st Cir. 1984), and we find none.

Before turning to the merits of the matter, the District Court first found that Ramdihall had no standing to challenge the search of the car because he was not an authorized driver on the

rental car. But we need not decide that question, because, even if we assume that Ramdihall did have standing to challenge the search of the car, his arguments on the merits are unavailing.

A person who is lawfully detained may still voluntarily give consent to a search. See United States v. Forbes, 181 F.3d 1, 6 (1st Cir. 1999) (noting that "the fact of custody alone is never enough to demonstrate coerced consent"). In determining whether consent was voluntarily given, we look to the totality of circumstances, including the person's "age, education, experience, intelligence, and knowledge of the right to withhold consent." Id. (citation omitted). We also consider "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." Id. (citation omitted).

Here, the District Court found that the search was consensual, and noted that "there was never any physical constraint, no handcuffing, no display of drawn weapons; the character of the interrogation was mild." Ramdihall now asserts that, in fact, "the detention was coercive and intimidating." But, in support of that assertion, he points only to the fact that an officer's "flashlight was directed into the car" and that, after Brosnihan first approached the vehicle to question him, five other officers eventually arrived as backup.

- 18 -

The voluntariness issue turns, however, not on whether Ramdhiall was detained, but on whether he was detained in a manner that precluded him from freely consenting to the search. And Ramdihall makes no argument as to how the facts he highlights, in light of our precedent, see, e.g., Kimball, 741 F.2d at 474, could, in and of themselves, support such a conclusion. Thus, Ramdihall's fallback argument fails.

## III.

We turn now to Ramdihall's challenge to the denial of his suppression motion concerning the traffic stop in Ohio. Here, too, we find no merit to the challenge.

## A.

Again, we must begin by recounting the relevant facts, which we take from the District Court's uncontested findings. See Campa, 234 F.3d at 737. On October 10, 2013, Ramdihall was driving in a rental car on Interstate 70 in Ohio. Hillaire was a passenger in the vehicle. An Ohio State Highway Patrol trooper, John Martin, pulled the car over for driving 90 miles per hour in a 70 miles-per-hour zone. When Martin asked to see Ramdihall's license and registration, Ramdihall opened the center console and then shut it "very quickly," during which time Martin saw "a plastic baggie" inside. Ramdihall told him that the bag contained tobacco.

Martin learned that the car was a rental that had been leased by an absent third party. Ramdihall was listed on the

- 19 -

rental agreement as an alternate driver. Martin also learned that Ramdihall and Hillaire were driving to Columbus from New York. Martin observed that there was no visible luggage and that the car had "a very clean compartment for people on the road for an extensive period of time."

Martin then went back to his police cruiser to write a speeding ticket. He also called a K-9 unit to come to the scene. Martin then returned to Ramdihall's car to ask for Ramdihall's and Hillaire's social security numbers. He also asked Ramdihall to accompany him back to the cruiser, which Ramdihall did.

In the cruiser, Ramdihall told Martin that Hillaire was unemployed. Ramdihall also told Martin that Ramdihall planned to move to Columbus, was visiting to check out the area, and would be returning to New York on Saturday or Sunday. Martin pointed out that the car rental would expire on Friday, and Ramdihall seemed surprised. Ramdihall also stated that he had "three clothes" with him on the trip, and that Hillaire had no clothes with him but would buy clothes as necessary in Columbus.

Martin ran Ramdihall's and Hillaire's social security numbers. He discovered that neither Ramdihall nor Hillaire had any drug convictions, though Hillaire did have a criminal history.

Martin finished writing the traffic ticket at 10:40 a.m. The K-9 officer, Ohio State Highway Patrol Trooper Shawn Milburn, arrived six minutes later, at 10:46 a.m. The dog alerted to the

presence of narcotics at 10:49 a.m. Between 10:46 a.m. and 10:49 a.m., both officers had smelled marijuana. Milburn then read Ramdihall and Hillaire their rights, as required under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).

After reading the men their rights, the officers searched the passenger compartment of the car, but did not find any marijuana. The officers then searched the trunk, where they found, under the spare tire cover, a bundle of seventeen credit cards in Hillaire's name, held together by rubber bands. Martin swiped the credit cards' magnetic strips through a card reader. By doing so, he discovered that the information recorded in some of the cards' strips did not match the numbers and expiration dates on the front of those cards, indicating that those cars were counterfeit. The officers later found tobacco in the baggie in the center console, and a small amount of marijuana in the passenger's side of the car, along with rolling papers.

**B.**

Ramdihall does not dispute that, during this traffic stop in Ohio, he was lawfully stopped for speeding and properly issued a ticket. He contends instead that Martin lacked reasonable suspicion to detain him beyond the time necessary to issue him that ticket. He thus contends that the seizure was unlawful because it persisted past the time needed to issue the ticket

solely in order to permit the K-9 unit to arrive and perform the dog sniff of the car.

The Supreme Court made clear in Rodriguez v. United States, 135 S. Ct. 1609 (2015), that, absent "the reasonable suspicion ordinarily demanded to justify detaining an individual," a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond the time necessary to handle the traffic violation that justified the stop. Id. at 1615. Reasonable suspicion may nonetheless develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose. Id. at 1616-17. The question in this case, therefore, is whether such reasonable suspicion developed.

"[T]he level of suspicion the [reasonable suspicion] standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (citations omitted). Reasonable suspicion requires more, however, than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. It requires that the officer be able to articulate "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id.

Although the concept of reasonable suspicion "defies precise definition," United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)), "some general guideposts" exist, United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011). "Prominent among these is the tenet that a finding of reasonable suspicion must be premised upon 'a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. at 27-28 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The particularity requirement ensures that the suspicion is "grounded in specific and articulable facts," id. at 28 (quoting Espinoza, 490 F.3d at 47), while "[t]he objectivity requirement dictates a focus on what a reasonable law enforcement officer in the same or similar circumstances would have thought," id.

Here, the District Court found -- and Ramdihall does not contest -- that the dog sniff occurred six minutes after Martin completed the traffic ticket. And, the District Court found that Martin had a reasonable and articulable basis for suspicion justifying that additional six-minute delay based on the following combination of facts: (1) Martin's observation of the plastic baggie in the center console; (2) the manner in which Ramdihall "surreptitiously" opened, and then quickly closed, that center console; (3) the fact that the vehicle was a rental and the renter was not with the vehicle, which Martin testified was an indication

- 23 -

of drug trafficking; (4) the fact that Ramdihall was from New York, Hillaire was from California, and they offered a dubious explanation for why they were en route to Columbus; (5) the inconsistency between Ramdihall's assertion that he and Hillaire would be in Columbus for several days and the fact that the rental was due to expire the following day; and (6) the absence of visible luggage in the vehicle, despite Ramdihall's assertion that he and Hillaire had driven to Ohio from New York for a multi-day trip.

In arguing that this combination of facts does not suffice to support a finding of reasonable suspicion, Ramdihall challenges, for one reason or another, the probative value of a number of the findings set forth above. But, as we will explain, those challenges fail because they either depend on unwarranted challenges to the credibility findings made below or on contentions about the lack of probative value of a particular finding when considered only in isolation, without regard to the significance that fact may have when considered as part of the other findings made by the District Court. Ramdihall also challenges a number of facts that the District Court did not rely on in concluding that there was reasonable suspicion, and which thus have no bearing on whether the District Court's reasonable suspicion determination was made in error. His challenge as a whole therefore fails.

In reaching this conclusion, we note that we review the District Court's factual conclusions and credibility

determinations only for clear error.  Tiru-Plaza, 766 F.3d at 114.

Under this standard, we must "grant significant deference to the

district court, overturning its findings only if, after a full

review of the record, we possess a definite and firm conviction

that a mistake was made."  Id. at 115 (citation omitted).  We note

as well that we review the District Court's legal conclusions --

including the District Court's determination that the officer did

have reasonable suspicion to justify the detention -- de novo,

while still "giv[ing] appropriate weight to the inferences drawn

by the district court and the on-scene officers," id., and while

being sure to consider the totality of the circumstances, id. at

116-17.[7]

We begin with Ramdihall's contention that, because there

are "thousands of uses for a plastic baggie" that do not "involve

criminal activity," the evidence that a plastic baggie was present

is of no consequence.  But the District Court did not find that

the presence of a plastic baggie in and of itself supports a

finding of reasonable suspicion.  The District Court instead

---

[7] In presenting his challenge to the District Court's ruling,
Ramdihall makes much of the fact that Martin testified at the
suppression hearing that he prolonged the stop to call for the K-9
unit based on a "hunch," given that a hunch alone does not create
reasonable suspicion.  See Navarette, 134 S. Ct. at 1687.  But the
District Court did not rely on Martin's testimony characterizing
his suspicion as a "hunch" in finding that reasonable suspicion
did exist.  Rather, as we have explained, the District Court found
that there was an objective basis to form reasonable suspicion
based on the enumerated circumstances described above.

credited Martin's testimony that, based on Martin's experience, the manner in which Ramdihall appeared to surreptitiously conceal the plastic baggie indicated that "there was probably some kind of illegal narcotics in there." Thus, the District Court found that the presence of the plastic baggie, combined with the surreptitious manner in which Ramdihall shielded it from view, gave rise to reasonable suspicion when considered in light of the other evidence that raised doubts about Ramdihall's story concerning his travel plans. And though the question may be close, Ramdihall does not offer a persuasive account of why, in combination, the facts available in the record render such a conclusion mistaken.

After all, neither Ramdihall nor Hillaire were from Ohio, and their explanation of why they were in Columbus -- on a multi-day trip to consider whether Ramdihall might move there -- was not corroborated by the other circumstances that Martin observed. It is also odd that Hillaire -- who Martin learned was unemployed and living in California -- would fly to New York for the purpose of visiting Ohio with Ramdihall, and would bring no clothes with him for the trip but plan, instead, to buy clothes in Ohio. Odd, too, is the fact that the rental was going to expire the following day, even though the trip, by Ramdihall's account, would not yet be over.

Moreover, Martin testified that when individuals in a rental vehicle are transporting drugs, "most of the time, the

renter of the vehicle is never with the vehicle." Instead, Martin testified, "[s]omeone rents [the vehicle] and then others transport the drugs." And, here, although Ramdihall was listed as an authorized alternate driver of the vehicle on the rental agreement, neither he nor Hillaire was the person who rented the vehicle. Thus, Martin concluded, the fact that the renter was not with Ramdihall and Hillaire was "another red flag."

In addition to these circumstances, Martin observed Ramdihall surreptitiously closing the console to conceal a plastic baggie. Given Martin's testimony that his experience with such matters suggested that this action by Ramdihall indicated that the baggie contained illegal narcotics, the record, taken as a whole, established a basis for supportably concluding that criminal activity was afoot.

Ramdihall appears to contend that his behavior in closing the console -- and thus obscuring the plastic baggie -- was not, in fact, surreptitious, as he was simply checking the center console for his license, registration, and insurance documents. And, Ramdihall also appears to suggest that the District Court erred in crediting Martin's contrary testimony on that point because Martin could not remember from where Ramdihall produced his license and rental agreement. However, our review of the District Court's decision to credit the testimony concerning the nature of Ramdihall's action in closing the console is for

clear error.  See id. at 114.  And none of the points that Ramdihall now raises gives rise to "a definite and firm conviction that a mistake was made" in that regard.  See id. at 115.

In a separate vein, Ramdihall takes note of the District Court's factual findings that the vehicle was unusually clean and that it contained no visible luggage, and he challenges the reasonableness of an inference that these facts give rise to suspicion of criminal activity.  But, although the District Court found that the vehicle was clean, it did not identify the cleanliness of the vehicle as a ground for reasonable suspicion. Nor did it even find that the fact that there was no visible luggage in the car constituted such a ground.  The District Court merely listed that fact as one of several in the course of explaining why it found that Ramdihall's professed account of his travels was "thin or dubious."  As we see no basis for disturbing that characterization of Ramdihall's account on this record even apart from the absence of visible luggage, Ramdihall's focus on that discrete aspect of the District Court's finding is misplaced. For when the problematic nature of Ramdihall's travel story is considered in combination with the supportable finding that Ramdihall surreptitiously concealed the plastic baggie, and Martin's testimony regarding the "red flag" posed by a rental vehicle with an absent renter, there is no basis for us to conclude, on this record, that the District Court erred in finding

that the totality of the circumstances gave rise to a reasonable suspicion of criminal activity.

Ramdihall next objects to attributing significance to Martin's testimony that New York, California, and Columbus, Ohio, are each sites of drug activity and that Interstate 70 is a main route of travel. But, the District Court did not rely on this part of Martin's testimony in finding reasonable suspicion. And Ramdihall fails to explain how the findings that the District Court did rely upon, in combination, are insufficient to justify the seizure's duration.

Ramdihall's next ground for challenging the denial of the motion to suppress with respect to this stop also fails. He argues that the circumstances of the car rental do not constitute grounds for suspicion. Specifically, Ramdihall contends that because he was listed as an alternate driver on the rental agreement, he was lawfully permitted to be driving the rental car even without the renter. He further emphasizes that his explanation that he was not the primary renter because he did not have a credit card was plausible. And, he contends it was not suspicious that the rental was set to expire the next day, because he reacted with "honest surprise" to learning that the rental was set to expire and because he could have easily extended the rental period. But, the circumstances of the car's rental must be considered as a part of the findings as a whole, including the

credited testimony regarding the surreptitious closing of the console to obscure the plastic baggie. When so considered, the circumstances of the car's rental do support the District Court's finding of reasonable suspicion.

Ramdihall does also contend that the real reason Martin prolonged the traffic stop for a K-9 sniff was because of racial bias. Ramdihall points to no evidence in the record to support this claim, however. And, in any case, while "the Constitution prohibits selective enforcement of the law based on considerations such as race[,] . . . the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Whren v. United States, 517 U.S. 806, 813 (1996). Thus, this argument, too, must fail.

Similarly unavailing is Ramdihall's apparent argument that the circumstances should have indicated to Martin and to the District Court that criminal activity was not afoot. Ramdihall emphasizes in this regard that neither he nor Hillaire acted in a nervous manner, that neither had any prior drug history, and that they were able to produce valid identification and a valid rental agreement. Ramdihall also contends that he proffered a plausible explanation of what he was doing in Ohio with Hillaire, arguing that it is "perfectly normal" for someone of Ramdihall's age to seek to move away from his family, that the assertion that

Ramdihall drove commercial trucks was plausible because no commercial license is needed for 26-foot trucks, and that he was able to answer Martin's questions about Hillaire, proving that they were in fact friends. But, in light of the totality of other circumstances, and especially the finding regarding the surreptitious closing of the center console to conceal the plastic baggie in combination with the inconsistencies in the explanations regarding Ramdihall's travel plans, the fact that the District Court could have concluded that no criminal activity was afoot does not render the District Court's inference to the contrary clear error. See United States v. Arthur, 764 F.3d 92, 96 (1st Cir. 2014) ("[A]bsent an error of law, we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record." (citation omitted)).

Finally, Ramdihall emphasizes that Milburn's testimony that the officers found marijuana hidden over the car's visor on the passenger side conflicted with Martin's testimony that the officers found the marijuana over the visor on the driver's side. In addition, Ramdihall contends that, prior to the search, Milburn stated that he smelled "raw marijuana," but that the search unearthed only "processed, not raw, marijuana."

But the District Court did not rely on testimony about where the marijuana was found or what Milburn smelled in concluding that there was reasonable suspicion sufficient to justify Martin

calling the K-9 unit in the first place. And so this conflict in the testimony does not itself undermine the District Court's ruling. Moreover, insofar as Ramdihall means to cast doubt on Martin's credibility, and thus perhaps to call in to question the District Court's crediting of Martin's testimony regarding the manner in which Ramdihall closed the console, we defer to the District Court's credibility determination in the absence of any "definite and firm conviction that a mistake was made."[8] See Tiru-Plaza, 766 F.3d at 114.

## C.

Ramdihall brings one final Fourth Amendment challenge regarding this stop. This challenge relates to the seventeen credit cards that the officers found under the spare tire cover in

---

[8] Ramdihall appears to challenge Martin's credibility in one further respect. He points to Martin's testimony that, prior to the dog sniff, Martin told Milburn where in the car Martin had seen the plastic baggie, and suggests that this aspect of Martin's testimony contradicts Milburn's testimony that Milburn tried "not to pay attention" to what Martin told him prior to the dog sniff so that it would not "look like I'm trying to make my dog alert to anything that's not there." But, the record shows that Milburn neither solicited the information about the plastic baggie from Martin, nor asked any follow-up questions. Thus, we see no inconsistency with Milburn's testimony that he tries "not to pay attention" to such information arising from the fact that Martin, unprompted, told Milburn where Martin had seen the baggie. To the extent that Ramdihall means to contest the reliability of the dog sniff, moreover, Ramdihall's counsel waived this argument below by specifically telling the District Court that he was not contesting the reliability of the dog sniff. See United States v. Sánchez-Berríos, 424 F.3d 65, 74 (1st Cir. 2005) (noting that "[a] party waives a right when he intentionally relinquishes or abandons it").

the trunk of the vehicle.  Ramdihall contends that the District Court erred in concluding that it was permissible under the Fourth Amendment for the officers to swipe those credit cards through a card reader because a person "might" have a reasonable expectation of privacy in the information stored on a credit card's magnetic strip.

But Ramdihall does not assert that a person does, in fact, have such an expectation of privacy.  He asserts only that a person might.  And he acknowledges that there is no evidence in the record that would support this conclusion.  Thus, even if we were to assume that such an argument could be developed, in light of the "perfunctory manner" in which Ramdihall raises this argument, "unaccompanied by some effort at developed argumentation," we deem the matter waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

**IV.**

For the foregoing reasons, we **affirm**.