# United States Court of Appeals
## For the First Circuit

No. 16-1377

UNITED STATES OF AMERICA,

Appellee,

v.

MARSHALL H. DION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Henry B. Brennan, with whom Brennan & Associates was on brief, for appellant.
John-Alex Romano, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Carmen M. Ortiz, United States Attorney, Leah B. Foley, Assistant United States Attorney, Leslie R. Caldwell, Assistant Attorney General, and Sung-Hee Suh, Deputy Assistant Attorney General, were on brief, for appellee.

June 8, 2017

**THOMPSON**, **Circuit Judge**. Marshall H. Dion moved to suppress evidence taken from a warrantless search of his truck. After the district judge denied that motion and his subsequent motion for reconsideration, Dion conditionally pled guilty, reserving his right to challenge the rulings on appeal. We affirm.

## I. BACKGROUND

As is our usual practice, we take the facts from the district court's decision and from the suppression hearing, presenting them in the light most compatible with the district court's ruling. See, e.g., United States v. McGregor, 650 F.3d 813, 816 (1st Cir. 2011). Given the importance of certain facts to our analysis, we ask the reader to bear with us as we wade through the minutiae.

### A Cross-Country Road Trip Interrupted

On June 18, 2013, on Interstate 70 in Kansas, Officer Nicholas Blake ("Blake"), of the Police Department of Junction City, Kansas, pulled seventy-eight-year-old Dion over for speeding. Blake, a ten-year veteran of the Department, is a canine handler whose job, in part, is to detect illegal narcotics through traffic stops. After observing a trio of speeding vehicles - two cars and a pickup truck - Blake clocked a reading of 79 mph, then 80 mph in the 75-mph zone. Blake explained that the radar provides the speed of the largest and fastest target, meaning that of the

three vehicles, the radar had latched onto the bigger pickup truck. So he pursued the truck and pulled it over.[1]

As he approached the stopped pickup truck from the passenger side, Blake observed that the truck sported Colorado plates and tinted windows on the cap of the truck's bed. He informed Dion (the driver and the car's only occupant) that he had been traveling over the speed limit. Dion responded that he had been following traffic, then, as requested by Blake, produced his Arizona driver's license. Blake posed a few questions, prompting Dion to explain that he was coming from Yardley, Pennsylvania, where he had met with his certified public accountant ("CPA"), and now was returning home to Tucson, Arizona.

Moving right along, Blake informed Dion that he planned to issue him a warning citation for speeding, and he asked Dion to get out of the truck and sit in the front seat of the police cruiser with him - this, Blake explained, was his normal procedure. As they made their way back to Blake's cruiser, Blake asked whether Dion had any weapons, and Dion answered he did not. During the walk to the cruiser, Blake peered into the back of the truck, through the tinted window of the truck cap. Dion, noticing this,

_____

[1] Our review includes the video recording of the encounter - Blake's cruiser was equipped with recording equipment that kicked in at the inception of Blake's pursuit of Dion's truck and continued through the roadside search of the truck. The recording tracked what happened both inside the cruiser and out.

offered to let the officer look in his truck. Blake found this "odd" and "suspicious" - based on his experience with "the innocent motoring public," it was not normal behavior.

Into the police cruiser they went. Blake asked Dion about what he did for a living, and Dion explained that he was retired and did not worry about money. Before Blake started to run Dion's information (driver's license, criminal history, registration information) through dispatch, Blake began preparing the warning citation. During this time, Blake followed up on Dion's travel plans, listening with interest to the specifics of Dion's trek to and from his CPA's office in Pennsylvania, what he did while there, and why he made the journey. Thinking it strange that Dion, who lived in Tucson, Arizona, would travel to Pennsylvania to see a CPA, he asked Dion whether there are CPAs in his hometown. And because Yardley, Pennsylvania was unfamiliar to Blake, he looked it up on Google Maps to check out the most likely route of travel between that town and Tucson. Based on his Google search, Blake testified the travel route "was off," and "the reasoning for [Dion's] travel seemed odd to [Blake]." Blake was also mindful that the stretch of Interstate 70 upon which they sat was a known drug-trafficking corridor. And all the while, throughout the encounter, Blake observed Dion to be "extremely nervous" (he could see Dion's "carotid artery pounding," and he

- 4 -

also observed Dion's "pulse in the area of his stomach underneath his shirt"), and this nervousness never abated.

A few moments later, Dion asked Blake about the code he used while talking with dispatch, and Blake explained he was using military shorthand, prompting a conversation about Blake's prior military service. Blake asked Dion whether he had a criminal record, and Dion offered that he had been arrested "for all kinds of things." By way of explanation, Dion told Blake that he had been arrested for marijuana about twenty-five years ago. Blake sought more information about the charges against Dion, and Dion explained that the charges were based on possession, telling Blake he could check his record to confirm as much.

At this point, Blake reiterated to Dion that he planned to issue only a warning. A conversation about the rules of the road ensued: the two men chatted about Dion being stopped for speeding, and Dion's misguided assumption that following the flow of traffic was fine, regardless of speed. In an effort to understand Dion's travel "story," Blake segued back into getting information about Dion's journey and also delved further into Dion's income source - Dion informed Blake that his income derived from social security, his pension, and owning certain real estate properties. Dion added, he owns property in Arizona, Colorado, and Massachusetts.

Pivoting, Blake directed Dion's attention to Blake's marijuana computer screen saver, explaining that Blake was looking for "that" (i.e., drugs or contraband). In response, Dion again offered to let Blake search his truck ("You can look in my truck"), then said it again, ("You can look in my truck. You want to look in my truck?"). Blake wanted to complete his collection and review of Dion's information, but accepted the offer. In a brief lull, Dion freely gestured towards the computer screen and said "that" (the picture of marijuana) was "twenty-five years ago" - and once again told Blake he could check his truck, despite it being a "losing proposition" (Dion's words).

Soon after this exchange, Blake hit pause on his citation drafting and called the El Paso Intelligence Center, identifying himself and providing Dion's full name, date of birth, the location of the stop, and the fact that the stop was for speeding. It was during this call that Blake heard from dispatch - the information provided by dispatch confirmed that Dion did indeed have a criminal record including charges related to both marijuana and cocaine. Still on the line, the Intelligence Center reported that Dion had been arrested not only for possession of a large quantity of drugs, as Dion had told him, but also for drug trafficking, and once was involved in a cash seizure. Blake testified that Dion's "drug trafficking history, which he obviously lied about," contributed to Blake's rising suspicions.

Dion asked what Blake had been searching, so Blake answered that he had done an interstate criminal record check. Eventually, Blake received information confirming that Dion's license and registration were legitimate, so Blake radioed dispatch to get a case number for the ticket he was writing up. Blake reminded Dion he would be issuing a warning only and no fine would be levied, then gave Dion back his paperwork. Dion quipped, "That's all I get?" and joked that he should get "lunch money." Blake interjected that the stop was over - Dion was "no longer being detained for speeding" - but added that Dion was "more than welcome to" stick around and talk if he wanted to.

## Time to Hit the Road?

Apparently wanting to chat, Dion stayed in the cruiser and continued bantering with Blake. Dion freely observed that he "could have shut [Blake] off at the very beginning," asked if he was under arrest, and refused to answer Blake's questions. He mused: "I used to be in the business" and "did time for marijuana." He continued, distinguishing dangerous drugs from the marijuana on Blake's screen saver. Blake told Dion he searches for travelers who are "hauling" drugs. The conversation continued, tackling the topic of the legalization of marijuana.

And then, once more, Dion offered Blake a look inside the truck. Dion said "sure" when Blake pressed for confirmation that he had permission to search the truck. Dion insisted he was

"clean," and reminded Blake that he was "out of the business," and Blake stated he would love to look in the truck if Dion would let him. Dion again agreed, but not without noting that, "normally, [he] would bust [Blake's] balls like [Blake was] busting [Dion's]," but declined to do so in a showing of appreciation for Blake's military service.

When they got out of the cruiser, they went to the truck and Dion opened the window on the upper part of the back of the truck. Blake, with Dion's permission, opened the tailgate, observing right off the bat deteriorating boxes, road atlases, and a refrigerator - to use Blake's word, "junk." But, according to Blake and his experience, this was not just any junk: it was what he called a "cover load," or a bunch of items deliberately piled up to disguise contraband.

After Blake checked the back right wheel area, he again surveyed the articles in the truck bed and asked Dion where the truck and its contents were coming from. Boston, answered Dion. Blake testified he found it odd that the materials came from Boston: Dion had mentioned having a residence in Massachusetts, but never indicated he had gone to Boston as part of this trip. Blake sought and got Dion's permission to take things out of the truck so he could look around. Blake began combing through the

pile of stuff, telling Dion that another officer was on his way[2] and then asking again whether there were any weapons. With the then-recent Boston Marathon bombing in mind, Dion joked to Blake that he had a backpack with some bombs in it - he quickly thought better of it and clarified that he was not serious.

Geary County Deputy Captain Coffman ("Coffman") then arrived. Blake filled him in on the information he had received about Dion and his interaction with Dion to that point. Blake resumed his removal of items from the truck while Dion and Coffman looked on.

Dion grew antsy and told the officers "I'm trying to make time." Blake replied, "The longer I stand here and talk to you about it, the longer it's going to take." And Blake told Dion he wanted to continue looking and would return everything to its rightful place when he was done. Dion said, "I thought I was being nice giving you permission." At that point, Blake told Coffman that Dion revoked his consent, and both stopped searching the truck. When Blake returned to where Dion was standing, Dion told him he wanted to head out. Blake told Dion if he wanted to get a move on, "that's fine," but "is it ok if I run my dog [who had been sitting in the cruiser's backseat] on the truck?" Dion said, "Yeah."

---

[2] Earlier in the stop, another officer texted Blake offering to provide assistance, and Blake accepted.

## The Scene Continues

Blake and his K-9 took a lap around the truck, during which the K-9 detected the odor of narcotics at the driver's side front wheel and front of the bed of the truck behind the cab. Specifically, the dog indicated (he had a change in behavior) to those locations, but did not alert (he did not bite, bark, or scratch) - the difference being that the dog had detected the odor, but not the source. Blake and his dog looped back towards the cruiser, and Blake reported to Dion, "He smells dope, bro." Blake asked Dion whether he had any cocaine, heroin, ecstasy, or marijuana, and Dion quickly answered "No" as to each. Dion paused and faltered when Blake asked whether Dion had large amounts of U.S. currency in the truck - he said, "Pardon me?" before uttering a few unintelligible words, then said he had about $6,000.

At this point, another officer had joined Blake and Coffman, and they climbed into the truck to continue the search. Their search led them to a number of FedEx boxes containing what amounted to almost $830,000. Blake testified, "[b]ased off of everything that had come up to that point, [he] believed that [the money] was contraband, either used as a direct source or derivative from the sale of narcotics or used to fund or buy drugs or some type of contraband or criminal activity or both."

In addition to the cash, the cops found a "Tucson-Boston" trip to-do list/checklist, a list of state toll booths accepting

Fast Lane payment, a spreadsheet containing business names and contacts, and handwritten and type-printed trip and mileage logs with stop locations, dates, times, gas totals and miles traveled, and an older computer printout for earlier trips. They also unearthed a Garmin GPS showing Dion's June 2, 2013 arrival in Boston and travel to a self-storage center in North Reading, Massachusetts, on June 3 and 6, 2013.

Dion was arrested and the cash was seized. The record is not crystal clear as to what he was charged with at that time, but for our purposes on appeal, it does not matter; the Kansas officers sent their investigative findings to authorities in Massachusetts, which led to those authorities looking into Dion and getting a search warrant for Dion's storage unit in Massachusetts. There, agents found 160 pounds of marijuana, drug ledgers, and $11 million in cash.

## Not in Kansas Anymore:  Proceedings

A federal grand jury indicted Dion on September 5, 2013 - the charges were conspiracy to possess with intent to distribute and to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), 846; possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1); and aiding and abetting in violation of 18 U.S.C. § 2. Dion moved to suppress the evidence against him,

arguing that it was acquired in violation of his Fourth Amendment rights. The government objected.

The district court conducted an evidentiary hearing before issuing an order denying the motion. The court found that the scope and duration of the stop were reasonable, Dion voluntarily consented to the search, and probable cause existed to support resuming the search in the wake of Dion's consent withdrawal. Because the court's probable-cause determination was "based only in part" on a K-9 indication, which Dion said was unreliable, the court granted Dion leave to file a motion to reconsider the probable-cause finding on that basis. Dion did just that, moving for reconsideration because, in his view, the K-9's unreliable indication could not support a probable-cause finding. The district court denied the motion.[3]

On October 15, 2015, Dion entered a conditional guilty plea, reserving his right to appeal the denial of his suppression

---

[3] Even if Dion's proffered expert opinion regarding the unreliability of the dog sniff was to be accepted, the court wrote, it would not "mean that the alert by the K-9 is entitled to no weight in the Court's probable cause analysis." The court took it one step further, indicating that even putting aside the reliability of the indication (mindful that the court's probable-cause finding was based only in part on the K-9 indication), probable cause for the search was supported by the court's previous ruling as to voluntary consent, observations of Dion's demeanor, the interactions with Dion, and the "cover load" discovered in the truck.

motion and motion for reconsideration.  After sentencing,[4] this timely appeal followed.

## II. <u>DISCUSSION</u>

We review the district court's findings of fact in connection with a suppression ruling for clear error and its legal determinations de novo.  <u>United States</u> v. <u>Dickerson</u>, 514 F.3d 60, 65-66 (1st Cir. 2008) (citing <u>United States</u> v. <u>Woodbury</u>, 511 F.3d 93, 95 (1st Cir. 2007)).  We "will affirm the ruling if 'any reasonable view of the evidence supports it.'"  <u>United States</u> v. <u>Polanco</u>, 634 F.3d 39, 41-42 (1st Cir. 2011) (quoting <u>United States</u> v. <u>Bater</u>, 594 F.3d 51, 55 (1st Cir. 2010)).  "Given the textured nature of these inquiries, appellate courts must proceed circumspectly and with regard for the district court's superior vantage point."  <u>United States</u> v. <u>Espinoza</u>, 490 F.3d 41, 46 (1st Cir. 2007) (citing <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994) (instructing that appellate courts reviewing the outcome of a motion to suppress must "exhibit great respect for the presider's opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand")).

With this in mind, we address the arguments made in the case before us.  Dion outlines his theory of the case as follows: (1) the questioning by Blake in the cruiser impermissibly extended

---

[4]     Dion was sentenced to 120 months' imprisonment.

the duration and scope of the traffic stop; (2) as to the first search, Dion did not voluntarily consent; (3) even if Dion gave consent, it was withdrawn, and there was no probable cause for the second/continued search of the truck; and (4) all evidence should be suppressed as a result of the illegalities surrounding the stop and the searches. At oral argument, Dion's counsel told this court that the district court did not err in its "listing of the facts," but rather it erred in failing to include "all of the favorable facts to the appellant."

The government counters: (1) Blake's conduct was within the permissible scope of a traffic stop, including his questioning, which was not unnecessary or part of a fishing expedition - and even to the extent his questions were not related to the purpose of the stop, the questions did not impermissibly extend the duration of the stop; (2) even if Blake's questions extended the duration of the stop, Blake had developed reasonable suspicion to detain Dion; (3) the initial search of the truck was permissible in light of Dion's voluntary consent; (4) the continuation of the search after Dion withdrew his consent was permissible because probable cause existed; and (5) suppression of the evidence is not warranted because there were no constitutional violations during the traffic stop.

It is our job to examine these arguments and the constitutionality of what went down after the stop.[5] As we get to work, we consider the totality of the circumstances.

## 1.  **The Questioning in the Cruiser**

According to Dion, Blake's questions (more than forty of them, by Dion's count) unreasonably elongated the stop beyond the time necessary to issue the warning citation, and those questions (part of a fishing expedition, he argues) were not related to the purpose of the traffic stop.[6] Blake taking the time to conduct a Google Maps search for Yardley, Pennsylvania contributed to this, Dion says.  Dion cites Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015), and United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999), to support his contention that Blake's questions should

_____

[5]      Before us, Dion does not challenge the initial stop of his vehicle for speeding, instead focusing his appellate contentions on Blake's post-stop actions, which Dion says exceeded the permissible scope of a Terry stop.  See Terry v. Ohio, 392 U.S. 1, 20 (1968).

[6]      Dion also argued to the district court that Blake's order to have Dion exit the vehicle and get into the cruiser expanded the duration of the stop, but he does not make this point in support of his arguments on appeal, so we do not address it.  See United States v. Sowers, 136 F.3d 24, 25 n.1 (1st Cir. 1998)("To the extent that arguments made at the suppression hearing are not renewed on appeal, we deem them abandoned." (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

Meanwhile, Dion argues on appeal that the dog sniff extended the duration of the stop and exceeded the basis of the stop.  But since he did not raise that angle below, we do not address that either.  See, e.g., United States v. Valerio, 676 F.3d 237, 246 n.2 (1st Cir. 2012) (noting that arguments raised for the first time on appeal are deemed waived).

have been confined to requesting Dion's license, registration, and insurance papers.

The government counters that Blake did not inappropriately extend the duration of the stop, all questions asked were in response to the emerging tableau and, no matter how you slice it, the questions didn't unreasonably prolong the stop (it wasn't a long stop, and Dion carried the conversation too).

Before we tackle these arguments, we provide the lay of the land on some Fourth Amendment traffic-stop principles. A routine traffic stop is more akin to a Terry stop than an arrest. Rodriguez, 135 S. Ct. at 1614 (citations omitted). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop, Illinois v. Caballes, 543 U.S. 405, 407 (2005), and attend to related safety concerns." Id. The Rodriguez Court explained that, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Id. at 1615 (alterations in original) (quoting Caballes, 543 U.S. at 408). This includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," id., as well as conducting criminal record searches to ensure officer safety, id. at 1616 (citations omitted). The Court went

on: when there is no reasonable suspicion of criminal activity, an officer can undertake checks unrelated to the purpose of the stop so long as those checks do not prolong the stop. Id. at 1614, 1615 (citations omitted). On the other hand, however, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. at 1612 (alterations in original) (emphasis added) (quoting Caballes, 543 U.S. at 407).

This brings us to the concept of reasonable suspicion in the context of a traffic stop. Investigatory stops have two components: (1) a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop, see Terry, 392 at 21; United States v. Ruidíaz, 529 F.3d 25, 28 (1st Cir. 2008); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); and (2) any action undertaken with respect to the stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation,'" Ruidíaz, 529 F.3d at 28-29 (quoting United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006)).

When examining "reasonableness" in these cases, we consider the totality of the surrounding circumstances. United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). The

reasonableness analysis "requires a practical, commonsense determination," Ruidíaz, 529 F.3d at 29 (citing Sowers, 136 F.3d at 28), and we have said that this "determination . . . entails a measurable degree of deference to the perceptions of experienced law enforcement officers," id. (citing Ornelas v. United States, 517 U.S. 690, 699 (1996); Chhien, 266 F.3d at 8).

"No simple, mechanical formula tells us what reasonable suspicion is, though we know that it is less than probable cause and more than a naked hunch." McGregor, 650 F.3d at 821 (citing Chhien, 266 F.3d at 6); see also United States v. Sokolow, 490 U.S. 1, 7 (1989). "And no one-size-fits-all template exists to sketch out whether an officer acted with reasonable suspicion." McGregor, 650 F.3d at 821 (citing Espinoza, 490 F.3d at 46). Instead, we must assess the presence of reasonable suspicion "in a commonsense, case-by-case way, taking in the whole picture." Id. (citing Chhien, 266 F.3d at 6).

Remember that "[a] Terry stop is not necessarily a snapshot of events frozen in time and place," but rather more closely resembles an ongoing process. Ruidíaz, 529 F.3d at 29. "For that reason, '[t]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold.'" Id. (alteration in original) (quoting Romain, 393 F.3d at 71). "[I]f an officer undertakes an investigation pursuant to a Terry stop, his ensuing actions must

be 'fairly responsive to the emerging tableau.'" Id. (quoting Chhien, 266 F.3d at 6); see also Sowers, 136 F.3d at 27. We have explained that, as an investigation unfolds, an officer's focus can shift, and he can "increase the scope of his investigation by degrees" when his suspicions grow during the stop. Ruidíaz, 529 F.3d at 29 (quoting Chhien, 266 F.3d at 6; citing Sowers, 136 F.3d at 27). Indeed, "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." Terry, 392 U.S. at 10.

Back to our case. Let's travel back: Blake was suspicious "[f]rom the very start" of the traffic stop. Dion's truck bore Colorado plates, but Dion had an Arizona license with a P.O. box; Dion oddly offered on multiple occasions during the stop for Blake to search the truck; Dion's "extreme nervousness" persisted throughout the stop; his reasoning for traveling - a long car trip from Arizona to Pennsylvania to consult his CPA - didn't add up; his travel route was off; the stretch of highway was a drug-trafficking corridor; and he concealed aspects of his drug-trafficking history.

Any one of those facts, standing alone, might not support reasonable suspicion. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Seizing on this observation, Dion tackles these facts one by one, arguing that each is not a basis for reasonable suspicion. Dion contends that: (1) his initial offer to Blake to

search the truck was not "odd" or suspicious, and neither the government nor Blake articulated any reason why it was; (2) the nervousness Blake observed is not an important factor in the reasonable-suspicion calculus and, regardless, the video of the traffic stop shows that Dion was not "particularly nervous"; (3) Dion's travel plans and route - though "off" in Blake's view - were not implausible, and so do not support reasonable suspicion; and (4) Blake did not learn of Dion's history of drug trafficking until after the stop was impermissibly extended, and Dion's twenty-five-year-old conviction was too old to support anything more than a hunch.

But the Supreme Court has flatly rejected just this sort of "divide-and-conquer analysis" because it is inconsistent with the requirement that courts examine the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 274 (2002) (citing Terry, 392 U.S. at 22). Indeed, "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance." Ruidíaz, 529 F.3d at 30; see also Terry, 392 U.S. at 22 (explaining that each act may be "perhaps innocent in itself," but taken together, the acts "warranted further investigation"). That is what we have here: "taking in the whole picture," McGregor, 650 F.3d at 821 (citing Chhien, 266 F.3d at 6), these facts are sufficient to support a reasonable suspicion that criminal activity was afoot, specifically that Dion was

involved in drug-related activities. Addressing each of Dion's points, but mindful of the totality of the circumstances, we briefly explain.

As Dion concedes, our case law allows an officer carrying out a routine traffic stop to request identification from the driver and to inquire into the driver's itinerary. See United States v. Fernandez, 600 F.3d 56, 60-62 (1st Cir. 2010); Chhien, 266 F.3d at 9. That's how this traffic stop began. Dion, who was driving a vehicle with Colorado plates, produced an Arizona license, and he described his travel itinerary as a return trip from a cross-country road trip to visit a CPA in Pennsylvania. A drive of that distance for that purpose is reasonably viewed as odd, to say the least, and that odd answer to a concededly appropriate question about travel itinerary both prompted and warranted Blake's follow-up questions in the cruiser on that subject,[7] as well as his Google Maps search, which revealed that the route Dion was traveling was "off" for his stated journey.[8]

---

[7] We deem Blake's questions about Dion's occupation and income — which Dion characterizes as outside of the scope of permissible inquiries for this traffic stop — to be comfortably within the bounds of reasonable follow-up questions. After all, Dion told Blake that he drove across the country to visit a CPA, presumably for a matter concerning his finances.

[8] In the course of arguing that Blake's questions impermissibly extended the scope of the stop, Dion seizes on Blake's admission that he was "looking beyond the traffic stop" when he questioned Dion. However, Dion's reliance on Blake's subjective intent in asking his questions is misplaced because the reasonable-suspicion analysis has an objective focus. See

- 21 -

See, e.g., United States v. Ramdihall, No. 15-1841, 2017 WL 2177140, at *6 (1st Cir. May 18, 2017) (relying on odd explanation of travel plans and the strange fact that the rental car's expiration fell in the middle of the supposed road trip to find reasonable suspicion); United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009) (explaining that defendant's implausible answers to officer's questions coupled with nervousness provided officer with reasonable suspicion that defendant had given a false name and might be involved in criminal activity, so "it was reasonable to undertake further questioning" to investigate).  We need not dwell on Dion's argument that this questionably odd explanation for the trip "was not implausible or deceptive" because the explanation for the trip was hardly the only suspicious occurrence during this traffic stop.

After Blake asked Dion to accompany him back to his cruiser while Blake issued the citation,[9] Dion volunteered an entirely unprompted offer for Blake to search his truck.  Contrary to Dion's contention on appeal, Blake explained why this spontaneous offer to search struck him as "odd" and "suspicious":

_____

McGregor, 650 F.3d at 822 ("[C]ourts do not 'plumb[]' an officer's 'actual motive' in performing a reasonable-suspicion analysis." (second alteration in original) (quoting Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004))); see also Ruidíaz, 529 F.3d at 29 (reasonableness in the traffic-stop context is "not dependent on an individual officer's subjective motives").
    [9]    Remember that, on appeal, Dion does not revisit his challenge to Blake's request for Dion to join him in the cruiser.

in his experience, it was odd and uncommon for someone to offer to have the officer search a vehicle. And, as we explained, we afford "a measurable degree of deference to the perceptions of experienced law enforcement officers." Ruidíaz, 529 F.3d at 29; see also Arvizu, 534 U.S. at 273 (explaining that reasonable-suspicion assessment "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (quoting United States v. Cortez, 449 U.S. 411, 418 (1981))). Moreover, the offer to search was not an isolated, one-time occurrence. Instead, during the time he spent in Blake's cruiser, Dion made multiple unsolicited offers to Blake to search his vehicle.

Furthermore, Blake stopped Dion on a known drug-trafficking thoroughfare, and he observed Dion to be nervous from the get-go — two factors that, while not indicative of criminal activity standing on their own, can (and should) be thrown into the reasonable-suspicion mix under our case law. See, e.g., United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990) (reasoning lateness of the hour, high-crime geographic location, and unusual conduct came together to support reasonable suspicion); United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988) (finding defendant's nervousness contributed to reasonable suspicion); United States v. Trullo, 809 F.2d 108, 111-12 (1st Cir. 1987)

(concluding reasonable suspicion was supported by activities taking place in "what [was] unquestionably a high crime area" and by the fact that defendant's "behavior was indicative of some sort of illegal transaction"). Citing United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005), Dion tries to minimize the role to be played by his nervousness in the reasonable-suspicion calculus. But McKoy is quite different from Dion's case. The McKoy defendant's nervousness — which was limited to appearing nervous and avoiding eye contact with two police officers as they approached his vehicle — was easily explained as "a common and entirely natural reaction to police presence." 428 F.3d at 40. That pales in comparison to Dion's sustained nervousness throughout the entire stop. Blake characterized Dion as "extremely nervous," and his observations of Dion's pounding carotid artery and "pulse in the area of his stomach underneath his shirt" confirm this assessment.[10] In fact, Blake elaborated that Dion's

---

[10] To the extent that Dion intends to rely on the video to discredit Blake's testimony about Dion's extreme nervousness, that argument is a nonstarter. The district-court judge, who had the benefit of hearing Blake's testimony and observing his demeanor, found Blake to be credible as a general matter, and, with respect to the specific point about Dion's nervousness, noted Blake's "first-person observations about Dion's nervousness during the stop even as he reiterated his intention to give him just a warning." Dion's one-sentence reference to the video falls well short of establishing that either the judge's credibility determination or her reliance on Blake's "first-person observations about Dion's nervousness" was clearly erroneous. See Espinoza, 490 F.3d at 46; Zapata, 18 F.3d at 975.

nervousness was unlike the nervousness commonly shown by stopped drivers (the "common and entirely natural reaction to police presence" we discussed in McKoy) when pulled over because it was so persistent, even after Dion was reassured that only a warning citation would issue.

Dion also complains that Blake's questions relating to Dion's criminal history had nothing to do with the purpose of the traffic stop for speeding. This contention may be true, but it ignores how the events were playing out, i.e. the emerging tableau of what Blake knew.[11] Blake already had concluded the route of Dion's journey seemed "off," Dion's offer to search the truck was odd, Dion was extremely and persistently nervous, and the encounter was playing out on a known drug-trafficking thoroughfare. In these circumstances, Blake was justified in asking Dion about his criminal history. See, e.g., Sowers, 136 F.3d at 27 ("Based on unfolding events, the trooper's attention (and, thus, his reasonable suspicions) shifted away from the equipment violations that prompted the initial stop toward a belief that the detainees were engaged in more serious skulduggery. Such a shift in focus is neither unusual nor impermissible." (citing Zapata, 18 F.3d at 974)).

---

[11] Plus, the Supreme Court has characterized a criminal-record check as a "negligibly burdensome precaution" that may be necessary in order to complete the mission of the traffic stop safely. Rodriguez, 135 S. Ct. at 1616.

Dion goes on to argue that his twenty-five-year-old conviction was far too old to support reasonable suspicion. This doesn't persuade either: in assessing all the circumstances, officers are permitted to consider all criminal misdeeds, regardless of when they took place. See McGregor, 650 F.3d at 822-23 (rejecting argument that a prior conviction was too old to be considered in reasonable-suspicion calculus). And in any event, it was not just the fact of conviction that Blake found suspicious. It was also significant that Dion misrepresented the extent of his criminal history by omitting that he had been on the hook not just for possession, but also trafficking, and that he had been caught up not just in marijuana, but also cocaine.

In sum, Blake's suspicions were mounting with nearly every passing moment. "Evaluating whether an officer's suspicions are (or are not) reasonable is a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances." Chhien, 266 F.3d at 8 (citing Florida v. Royer, 460 U.S. 491, 500 (1983)). As we examine those suspicions, we give deference to Blake's perceptions. See id. Here, Blake's growing suspicions (and questioning) were reasonable. As we have said, these stops are an "ongoing process," and for that reason, the appropriateness of what Blake did depends on what he knew (or had reason to believe) and how the events of the stop unfold. See Ruidíaz, 529 F.3d at 29 (citing Romain, 393 F.3d at 71). Indeed, the focus of the stop

can shift, as it did here, and Blake permissibly "increase[d] the scope of his investigation by degrees" as his suspicions grew. Id. (quoting Chhien, 266 F.3d at 6; citing Sowers, 136 F.3d at 27 (giving the okay on increasingly intrusive questions and unrelated questions when suspicions escalate during a stop)). The questions Blake posed fell squarely within this universe of authority, and to the extent those questions (and his Google Maps search for Yardley) elongated the stop, it was permissible.[12]

Overall, on this record, there was nothing unconstitutional about what happened in the cruiser, and we do not find error in the district court's finding that the duration and scope of this stop were permissible.

---

[12] Dion's reliance on Pruitt in support of his argument is misplaced. In Pruitt, an Eleventh Circuit traffic-stop case, a police officer unreasonably elongated the traffic stop by embarking on a fishing expedition without the benefit of any reasonable suspicion of criminal activity: the court observed that the officer neglected to start writing the ticket, instead asking unrelated questions. 174 F.3d at 1221. The court said that the officer should have focused his questions on getting the driver's license, registration, and insurance papers, and then, because there was no reasonable suspicion to detain the driver and passengers, they "should have been free to go." Id. But we are not bound by Pruitt, which we see as distinguishable anyway, and, moreover, the Eleventh Circuit limited Pruitt to situations where the unrelated questions unreasonably prolonged the detention. See, e.g., United States v. Purcell, 236 F.3d 1274, 1280 (11th Cir. 2001) (explaining that "the unrelated question did nothing to extend the duration of the initial, valid seizure" and the detention was not "of an excessively long duration"). Here, as we have explained, Blake had reasonable suspicion, much more than the Pruitt officer's "unsupported hunch," and the stop was not unreasonable in scope or duration. 174 F.3d at 1221.

The focus of the encounter then shifted to a search of Dion's truck, which Blake undertook with Dion's consent. But because Dion contests the voluntariness of that consent, we move along to that argument.

### 2. The Initial Search of the Truck

Dion tells us that his consent to search the truck was not freely given. He argues that: Blake coerced Dion's consent through the prolonged questioning and "misrepresentation" and "trickery," namely that Blake did not advise Dion that he could refuse to consent to the search and made "repeated statements that he was looking for drug traffickers"; Blake did not tell Dion he was free to leave; Dion was not actually free to leave when Blake said the stop was over; Dion was detained when the consent was given; and multiple officers were present, contributing to the involuntariness of the consent. He tells us, in support of his argument, that he exhibited a discomfort during the search and stated his desire to end the search, and he seems to contend that the officers' conduct during the search (Blake's comment, "the longer I stand here and talk to you . . . , the longer it's going to take," and Coffman's continued search) demonstrates that Dion hadn't consented. He further argues that his consent was vitiated

because it was the product of the constitutional violations as to the scope and duration of the stop.[13]

Not so, says the government. Dion made various unsolicited offers to search, and that Blake did not inform Dion that he could refuse consent does not spell coercion or render consent invalid. Instead, Dion's age and experience were such that he knew he could refuse to consent. Furthermore, the detention of Dion - justified by reasonable suspicion, says the government - similarly does not vitiate consent. Citing Dion's bragging about knowing he could refuse to cooperate, the government tells us Dion knew he was free to leave despite not being explicitly told so by Blake.

For our part, whether Dion freely consented to the search is a question of fact, which we review for clear error. See United States v. Dunbar, 553 F.3d 48, 56-57 (1st Cir. 2009). To determine whether consent was voluntarily given, we look to the totality of circumstances, including the person's "age, education, experience, intelligence, and knowledge of the right to withhold consent." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (citation omitted). We also consider "whether the consenting party was advised of his or her constitutional rights and whether permission

---

[13] Having already decided the scope and duration of the stop were permissible, we do not tackle this part of Dion's argument.

- 29 -

to search was obtained by coercive means or under inherently coercive circumstances." Id. (citation omitted).

Based on the multifaceted levels of the offers to search, consent(s) given, and searches conducted, at this point we limit our discussion of consent to that which was given as to the first, initial search of the truck. The district court found that Dion's consent was voluntary, and unless that finding is clearly erroneous, we must accept it. Chhien, 266 F.3d at 7 (citing United States v. Coraine, 198 F.3d 306, 308-09 (1st Cir. 1999)). Upon close review of the record, we spy no clear error in that finding.

Let's recap: Dion first offered to let Blake search the truck after Blake peered into the truck's back window. Dion again offered to let Blake search the truck after Blake told Dion that the stop was over. Meanwhile, we - and Blake - know that Dion was seventy-eight years old on the day Blake pulled him over, and the record reflects he had prior experience with the criminal justice system. At the end of the traffic stop (with Dion still hanging out inside the cruiser after Blake told Dion he could stay and chat if he wanted, but the stop was over), Dion told Blake that he knew that he did not have to answer any questions. Actually, what he told Blake was that he "could have shut [Blake] off at the very beginning," and he could have "bust[ed] [Blake's] balls," meaning he could have been uncooperative and refused to answer any questions.

"Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.'" Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). Here, there is nothing to support Dion's claim of coercion and trickery or that Blake's statements that he was looking for drug traffickers rendered Dion's consent involuntary.[14] Again, Dion made multiple unsolicited offers to Blake to search his vehicle - including one offer made even before Dion was in the cruiser - so the consent given wasn't exactly a one-off. Instead, it was a repeated offer to search that, eventually, was accepted. And the conversational tone and nature of the encounter belies any suggestion that the offers to search were coerced or the result of Dion not being told that he could refuse to consent to a search, which "does not automatically render [Dion's] consent invalid." United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008); see also Chhien, 266 F.3d at 7 n.5 (citing Ohio v. Robinette, 519 U.S. 33, 39-40 (1996)

---

[14] To the extent that Dion's argument about trickery encompasses his point at oral argument - that Blake wasn't engaging in innocent personal chatter, but rather he was making conversation and asking questions designed to give him reasonable suspicion - we are not persuaded by this either. "[S]o long as manipulative behavior does not cause us to question whether the relinquishment was in fact voluntary . . . , it is 'reasonable' within the meaning of the Fourth Amendment." United States v. Hornbecker, 316 F.3d 40, 49 (1st Cir. 2003) (citing Schneckloth, 412 U.S. at 222–27). Indeed, "insincere friendliness which successfully induces a criminal suspect to willingly answer questions and/or consent to a search does not, without more, cause us to question whether the suspect's response is 'voluntary.'" Id.

- 31 -

(concluding that an officer conducting a highway stop need not inform the driver that he is free to go before requesting permission to conduct a search)). Besides, as discussed, this wasn't Dion's first rodeo: Dion's age and experience tell us that he knew that he could refuse to consent.

Blake not explicitly telling Dion that he was free to go also fails to persuade us that the consent wasn't freely given. Blake communicated to Dion that the stop was over, but Dion could stay and chat if he wanted to. The clear implication here, especially in light of Blake's statement that Dion was "no longer being detained for speeding," is that Dion was free to go. Nor was the consent vitiated because Blake didn't actually consider Dion free to go: such uncommunicated intent fails to move the needle. See, e.g., United States v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986) (concluding that officers' intentions were relevant only to the extent that they were communicated to the defendants); see also Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (disregarding "policeman's unarticulated plan" with respect to whether the suspect was in custody because "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

As to Dion's suppositions that the consent was involuntary because he was detained and because multiple officers were present, both fall short. "A person who is lawfully detained

- 32 -

may still voluntarily give consent to a search," Ramdihall, 2017 WL 2177140, at *6 (citing Forbes, 181 F.3d at 6 (noting that "the fact of custody alone is never enough to demonstrate coerced consent")), and, at a maximum, only three officers made an appearance, cf. id. (consent was valid where six officers were on the scene).

As part of a more sweeping argument as to consent, Dion also points to his discomfort during the search and his desire to end the search as further proof that he didn't consent. And he seems to complain that the officers' conduct during the search amounted to coercion (when Dion said "I'm trying to make time," Blake replied, "The longer I stand here and talk to you about it, the longer it's going to take"). But Dion's post-consent conduct is of marginal, if any, relevance - Dion made multiple offers to search, so Dion's complaints on this point smack more of buyer's remorse than of proof that the consent wasn't voluntarily offered. Same goes for the officers' conduct. Once Dion gave consent to search, undertaking the search is permissible. Based on the record, Blake's "the longer it's going to take" statement was not coercive as much as an indication that he was simply trying to execute an efficient, uninterrupted search. And moreover, Dion's consent-withdrawal is not the clearest - again, we assumed for argument's sake that he did effectively withdraw consent, but it's

hardly clear. In any event, once Dion said, "I thought I was being nice giving you permission," the search was quickly suspended.

The district court found that the consent given by Dion at the beginning of the stop and the consent given at the end of the discussion in the cruiser were voluntary, and that finding is supported by the record evidence and is free of clear error.[15]

Dion has a response to this, too: even if he gave consent, he withdrew it while the search was underway. We turn to that next.

### 3. Withdrawn Consent and Probable Cause

Dion argues that his consent was withdrawn when it became clear that Blake was going to search Dion's truck thoroughly, and there was no probable cause for the second, continued search of the truck. The government agrees that probable cause must be shown if the consent was revoked.

We look at probable-cause determinations de novo. See, e.g., United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011). Because we can dispose of the merits of Dion's arguments on the probable-cause analysis, we assume without deciding that Dion did

---

[15] We would next turn to Dion's contention that the search cannot be supported by reasonable suspicion, but there is no need. Because we conclude the consent was voluntarily given, reasonable suspicion need not be shown.

indeed revoke his consent to the search.[16]   But first, some background.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures in the absence of a warrant supported by probable cause.  U.S. Const. amend. IV.   The automobile exception provides that "police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband."  United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014); see also Florida v. White, 526 U.S. 559, 563–64 (1999).

"Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'"  Silva, 742 F.3d at 7 (quoting Robinson v. Cook, 706 F.3d 25, 32 (1st Cir. 2013)); see also Florida v. Harris, 133 S. Ct. 1050, 1055 (2013).  Importantly, "[t]he test for probable cause is not reducible to 'precise definition or quantification,'" Harris, 133 S. Ct. at 1055 (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)), but rather "[t]he

---

[16]   As we know, Dion became anxious to leave while the search was underway, telling the officers "I'm trying to make time."  When Blake told Dion he wanted to continue looking and would return everything to its rightful place when he was done, Dion said, "I thought I was being nice giving you permission."  At that point, Blake told Coffman that Dion revoked his consent, and they stopped searching the truck.

standard is satisfied when the totality of the circumstances create 'a fair probability that . . . evidence of a crime will be found in a particular place,'" Silva, 742 F.3d at 7 (omission in original) (quoting United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009)). And that means all that is required is the kind of "fair probability on which reasonable and prudent people, not legal technicians, act." Harris, 133 S. Ct. at 1055 (internal quotation marks and alterations omitted) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)); see also Polanco, 634 F.3d at 43 (explaining that "probable cause only requires a fair probability - which is well short of certainty - that evidence of criminal activity will be found in a particular place"). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." Harris, 133 S. Ct. at 1055 (omission and alteration in original) (quoting Gates, 462 U.S. at 235).

The facts as found by the district court support a determination that probable cause existed. For starters, Dion's "off" route from Yardley, Pennsylvania to Tucson, Arizona, his various unsolicited offers to search his truck, his "extreme nervousness," his previous brushes with the criminal justice system due to trafficking, and his inaccurate statements about his criminal history all militate in favor of probable cause. Add to that the later observations by Blake: the "junk" in the trunk

that (based on Blake's experience) looked like a cover load; Dion's account that the contents of the truck came from Boston, Massachusetts when Boston previously hadn't been mentioned as a destination or stop during his trip; Dion's persistent extreme nervousness throughout the stop and search; the uptick in Dion's nervousness during the search; Dion's sudden eagerness to hit the road once the search was underway; and Dion's "Pardon me?" response when Blake asked about large amounts of currency (evasive stalling response to question about large sums of cash versus quick and assured "no" answers to questions about having various drugs).[17]

Viewing all of these circumstances in their totality - as we are required to do - we conclude that Blake had reason to believe Dion was trafficking contraband, and a search of his truck

---

[17]    We do not list among these factors the K-9 indication, the reliability of which was hotly contested below.  The indication is only one of many pieces of record evidence supporting probable cause, and our conclusion does not depend on its inclusion in our calculus.    Also, Dion says we cannot consider his consent-withdrawal as a way of supporting probable cause - he says that revocation should not be used against him.   But we do not focus our attention on his purported consent revocation.   Instead, we look, in part, to his sustained and mounting nervousness as the search progressed.  See, e.g., United States v. Henry, 827 F.3d 16, 28 (1st Cir. 2016) (relying, in part, on the defendant's nervousness and anxiety during questioning to support probable-cause finding); United States v. Brown, 457 F.2d 731, 733 (1st Cir. 1972) (finding probable cause to arrest when, in addition to other factors, the defendant appeared not just initially nervous, but "increasingly nervous" as the encounter wore on); see also United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) (citing as one of the factors supporting probable cause the defendant's "extreme nervousness beginning with the stop of the vehicle and increasing during the search of the trunk of the car").

would yield evidence of that. In other words, by the time the officers resumed their search after Dion arguably withdrew his consent, leading to the discovery of the cash tucked away in the FedEx boxes, they had the requisite probable cause they needed to do so.[18] See, e.g., United States v. Collazo, 818 F.3d 247, 260 (6th Cir. 2016), cert. denied, 137 S. Ct. 169 (2016) (concluding that conflicting stories about travel plans, plus nervousness, may be considered as part of the probable-cause analysis); United States v. Champion, 609 F. App'x 122, 126 (4th Cir. 2015) (counting the occupants' "inconsistent answers as to their travel plans" in the probable-cause calculus because "the inconsistencies supported an inference of ongoing criminal activity"); United States v. Maldonado, 356 F.3d 130, 137 (1st Cir. 2004) (affirming probable-cause finding when the driver told a strange travel story and the officer's "experienced eye" spotted a cover load); West, 219 F.3d at 1178-79 (giving weight to the defendant's "extreme and continued nervousness" and the defendant's prior criminal record for serious offenses to support the probable-cause determination).

---

[18] It is unclear whether Dion is arguing that the dog sniff constituted an unlawful extension of a completed traffic stop in the absence of reasonable suspicion under Rodriguez. To the extent Dion intended to make this argument, it is meritless in the circumstances of this case. Putting aside the fact that Dion arguably consented to allowing Blake to walk the K-9 around the car, the officers had, for reasons discussed above, probable cause to search the car — more than mere reasonable suspicion of criminal activity — at the time of the dog sniff.

### 4. Suppressing the Evidence

Dion says all of the evidence seized as a result of the search must be excluded as the "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 488 (1963). Because we see no constitutional violations, we need not address this argument.

### 5. Final Thoughts

Dion argues, seemingly as a catch-all, that the district court erred in its failure to list facts most favorable to Dion. "We 'construe the record in the light most favorable to the district court's ruling,'" United States v. Dancy, 640 F.3d 455, 461 (1st Cir. 2011) (quoting United States v. Cook, 277 F.3d 82, 84 (1st Cir. 2002)), "and we 'will uphold the denial of a motion to suppress as long as any reasonable view of the evidence supports it,'" id. (quoting United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011)). Here, as discussed in great detail above, the district court did not clearly err in its factual findings. That Dion believes that certain other facts deserved more weight than they received from the district court does not alter this conclusion - the evidence in the record supports the district court's findings, and that is that.

## III. CONCLUSION

For all of these reasons, we uphold the orders of the district court.

**Affirmed.**